1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  PHILONG HUYNH,                          Case No.: 15cv1924-BTM (AGS)

12                          Petitioner,

13  v.                                      **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND ISSUING A LIMITED CERTIFICATE OF APPEALABILITY**

14  J. LIZARRAGA, Warden,

15                          Respondent.

16

17        Philong Huynh is a California prisoner proceeding pro se and in forma pauperis with

18  a Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.[1] (ECF No. 1.)

19  He challenges his convictions in the San Diego County Superior Court for one count of

20  first degree murder with special circumstances, and four counts of oral copulation and

21  sodomy of an intoxicated person, for which he was sentenced to life in prison without the

22  possibility of parole plus ten years. (Id. at 1-2.) He alleges his federal constitutional rights

23  were violated because there is insufficient evidence to support the convictions (Claim 1),

24  he is actually innocent (Claim 2), he received ineffective assistance of counsel (Claim 3),

25  _____

26  [1] Although this case was randomly referred to United States Magistrate Judge Andrew G.

27  Schopler pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a

28  Report and Recommendation nor oral argument are necessary for the disposition of this
    matter. See S.D. Cal. Civ.L.R. 71.1(d).

                                          1

was denied due process (Claim 4), and was subjected to an unreasonable search and seizure (Claim 5). (Id. at 6-9; ECF No. 1-1 at 3-12.)

Respondent has filed an Answer (ECF No. 16), two Supplemental Answers (ECF Nos. 21, 50), two notices of lodgment of the state court record (ECF Nos. 12, 17), and a corrected notice of lodgment (ECF No. 83). Respondent argues habeas relief is unavailable because: (1) the actual innocence and search and seizure claims are not cognizable on federal habeas and are without merit, (2) the due process claim is vague and conclusory, and (3) the state court adjudication of the insufficiency of the evidence claim on direct appeal, and of the ineffective assistance of counsel claim on state habeas, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (ECF No. 16-1 at 3-11; ECF No. 21 at 2-4; ECF No. 50 at 2-8.)

Petitioner has filed a Traverse (ECF No. 18), two Supplemental Traverses (ECF Nos. 30, 62), and seventeen Requests for Judicial Notice (ECF Nos. 10, 28, 37, 39, 41, 43, 47, 49, 53, 57, 63, 66, 72, 74, 76, 78, 89.) He also filed a Motion for Appointment of Counsel (ECF No. 32), a Motion for Discovery (ECF No. 65), and a Motion for an Evidentiary Hearing (ECF No. 80), which were denied without prejudice to consideration of those requests in this final Order. (ECF Nos. 45, 67, 75, 81.)

## I.    Procedural Background

In a five-count Information filed in the San Diego Superior Court on March 18, 2010, Petitioner was charged with one count of murder (victim Williams), two counts of sodomy of an intoxicated person (victims Williams and Jeremiah), and two counts of oral copulation of an intoxicated person (victims Williams and Jeremiah). (ECF No. 17, Clerk's Tr. ["CT"] at 44-46.) The murder charge contained two special circumstance allegations, that the murder was committed during the commission or attempted commission of oral copulation, and during the commission or attempted commission of sodomy. (Id.) On June 24, 2011, a jury found Petitioner guilty on all charges and returned true findings on both special circumstance allegations. (CT 726-31.) On August 12, 2011, he was sentenced to life without the possibility of parole on the murder count, plus consecutive

terms of eight years for sodomy of Jeremiah and two years for oral copulation of Jeremiah, with sentences on the oral copulation and sodomy of Williams stayed. (CT 733.)

In his direct appeal, Petitioner claimed, as he does in claim one here, that insufficient evidence supports the convictions as to Williams, and as he does in claim five here, that the jury was improperly instructed, he was denied his right to confront witnesses, the sex offenses were improperly allowed to be used as propensity evidence, and the cumulative effect of the errors was prejudicial. (ECF No. 12-2.) The state appellate court affirmed on December 20, 2012. (ECF No. 12-4.) The same claims were presented in a petition for review filed in the California Supreme Court, which was summarily denied on April 11, 2013. (ECF Nos. 83-5, 83-6.) A petition for a writ of certiorari to the United States Supreme Court was denied on October 7, 2013. (ECF Nos. 12-6 and 12-7.)

Petitioner constructively filed a habeas petition in the California Supreme Court on December 16, 2014, presenting most of the claims raised here, including those already denied on direct appeal.[2] (ECF No. 83-4.) That petition was denied on March 11, 2015, with an order which stated: "The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Lessard* (1965) 62 Cal.2d 497, 503; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Lindley* (1947) 29 Cal.2d 709, 723.)" (ECF No. 12-10.)

## II. Statute of Limitations

The Magistrate Judge issued an Order to Show Cause why this action should not be dismissed as untimely, finding that although Petitioner filed a Petition in this Court in So.Dist.Ca Civil Case No. 14cv2452-BEN (RBB) on the last day of the one-year statute of limitations identical to the Petition here, it was dismissed for failure to exhaust state court remedies, and the Petition here, filed after exhaustion, could not relate back to that Petition. (ECF No. 67.) Respondent replied that it was error to have admitted in the Answer that

---

[2] Petitioner is entitled to the benefit of the "mailbox rule" which provides for constructive filing of court documents as of the date they are submitted to the prison authorities for mailing to the court. Anthony v. Cambra, 236 F.3d 568, 574-75 (9th Cir. 2000).

1 | this action is timely, and argued the Petition is untimely because it does not relate back to
2 | the original, timely Petition. (ECF No. 71.) Petitioner replied that Respondent has waived
3 | the affirmative defense of timeliness by not raising it in the Answer and that equitable
4 | considerations render this action timely, and in any case the Court allowed him to amend
5 | his petition after exhausting state court remedies. (ECF No. 70.)

6 | The one-year statute of limitations to file a federal habeas petition began to run on
7 | October 8, 2013, the day after the United States Supreme Court denied certiorari, and,
8 | absent tolling, expired on October 7, 2014. Patterson v. Stewart, 251 F.3d 1243, 1246 (9th
9 | Cir. 2001). Petitioner filed the instant Petition on August 24, 2015, after expiration of the
10 | limitations period. However, he constructively filed a federal habeas petition in this Court
11 | presenting the same claims on October 7, 2014, the last day of the limitations period. (See
12 | So.Dist.Ca. Civil Case No. 14cv2452-BEN (RBB), Pet. [ECF No. 1] at 11.) When that
13 | initial federal petition was filed, claims one and five had been denied on direct appeal in
14 | the state appellate and supreme courts, and state judicial remedies were exhausted as to
15 | those claims. In that petition he stated he had raised those two claims on direct appeal in
16 | the state appellate and supreme courts (id. at 2-3, 9), but also checked the "no" boxes as to
17 | all claims on the petition form where it asked if he had raised them in the California
18 | Supreme Court. (Id. at 6-9.) That petition was dismissed for failure to allege exhaustion
19 | as to any claim, without prejudice to refile after exhaustion. (Id., order filed 10/22/14 [ECF
20 | No. 3] at 1-4.) A first amended petition with the same contradictory exhaustion allegations
21 | was dismissed for failure to allege exhaustion as to any claim, although it also alleged
22 | claims one and five were exhausted. (Id., order filed 1/14/15 [ECF No. 7].) Petitioner was
23 | granted leave to file a second amended petition by March 6, 2015 and informed that if he
24 | failed to allege exhaustion by that time "this case will remain dismissed and Petitioner will
25 | have to file a new petition which will be given a new case number." (Id. at 3.)

26 | Petitioner presented the majority of his unexhausted claims in a habeas petition filed
27 | in the California Supreme Court on December 16, 2014, which was denied on March 11,
28 | 2015. (ECF No. 12-10; ECF No. 83-4.) Because the March 6, 2015 deadline to amend in

the first case expired before his state exhaustion petition was denied on March 11, 2015, he did not file a second amended petition in the first case, but followed the directions of the January 14, 2015 dismissal order and filed a new federal habeas case which was given a new case number, the instant case. Petitioner argues the instant Petition relates back to the original timely petition due to excusable mistake, and any untimeliness or default can be excused by equitable tolling, actual innocence, or due to ineffective assistance of appellate counsel. (ECF No. 1-1 at 8, 11; ECF No. 18 at 35; ECF No. 72 at 3.)

It was apparent from the face of the petition and first amended petition in the original case that Petitioner had timely initiated his federal habeas proceedings on the last day of the one-year statute of limitations and had alleged exhaustion as to two of the five claims. The Court erred in dismissing it without allowing Petitioner to abandon the unexhausted claims or considering whether a stay and abeyance was appropriate. See Rhines v. Weber, 544 U.S. 269, 277-78 (2005) (holding that when faced with a mixed petition a district court should dismiss without prejudice to raise the claims after exhaustion, or, if that might result in Petitioner losing the opportunity to present his claims due to the operation of the one-year statute of limitations, consider whether to exercise its discretion to stay the action and hold the petition in abeyance during the exhaustion process.); Anthony, 236 F.3d at 574 ("This court has made clear that district courts must provide habeas litigants with the opportunity to amend their mixed petitions by striking unexhausted claims as an alternative to suffering dismissal.") Respondent states in the Answer:

> The Petition appears timely. 28 U.S.C. § 2244(d). Huynh indicates in his current Petition that he previously filed a petition in the district court in case number 14cv2452. Indeed, the district court's docket indicates that Huynh filed a petition in case 3:14cv2452 on October 14, 2014. (See Lodg. 11.) Because the claims in the current Petition were also raised in the petition filed on October 14, 2014, it appears the claims are timely.

(ECF No. 16 at 2.)

In response to the Order to Show Cause why this action should not be dismissed as untimely, Respondent "agrees" with the Magistrate Judge that this action cannot relate back

to the previously dismissed Petition in the prior federal case, states that it was "error" to admit the Petition here is timely, and, without discussing the erroneous nature of this Court's dismissal of the prior case, argues the Petition here is untimely because relation back is unavailable. (ECF No. 71 at 2.) Petitioner contends he followed this Court's order of dismissal in the prior case, argues Respondent should not be allowed to avoid the waiver of the affirmative defense of timeliness, and contends equitable considerations permit the Court to find this action timely. (ECF No. 70 at 1-13.)

The Magistrate Judge and Respondent are both incorrect in stating that the claims in this case, which are the same claims contained in the previously dismissed petition in the prior case, cannot relate back to the timely-filed petition in that prior case. Although there is a general rule in the Ninth Circuit that new petitions in new cases cannot relate back to old petitions in dismissed actions where the district court did not retain jurisdiction over the dismissed action, see e.g. Henry v. Lungren, 164 F.3d 1240, 1241 (9th Cir. 1999), there is an exception for the case, as here, where the erroneous dismissal of the original action caused the new petition to be untimely. See Anthony, 236 F.3d at 574 (holding that district courts have equitable powers to correct their own mistaken dismissal order and allow relation back to a previously dismissed petition); Rasberry v. Garcia, 448 F.3d 1150, 1155 (9th Cir. 2006) ("[I]n Anthony the district court exercised its equitable power to accept the new petition nunc pro tunc to the date of the original habeas filing-the district court had mistakenly dismissed the first petition, so it corrected the mistake by relating the second petition back to the first. Anthony does not stand for the proposition that a second habeas petition can relate back to a previously dismissed first petition [where no such mistake occurred], but merely endorsed the district court's exercise of its equitable power to correct a mistake. Anthony does not extend beyond that context.")

The Ninth Circuit, in a case which is not controlling because it was vacated when that Court learned the petitioner had died prior to the date the opinion was filed, has indicated that a district court faced with an erroneous dismissal should, if necessary to avoid having claims barred by the statute of limitations, reopen the prior case pursuant to

6

Fed.R.Civ.P. 59(e) or 60(b) rather than rely on a relation back theory. See e.g. Griffey v. Lindsey, 345 F.3d 1058, 1062-64 (9th Cir. 2003), vacated, 349 F.3d 1157 (9th Cir. 2003). Although Griffey noted that relation back under Rule 15 is not permitted where the prior case was dismissed and a final judgment entered, id. at 1062-63, no judgment, final or otherwise, has been entered in the prior case here. See So.Dist.Ca Civil Case No. 14cv2452-BEN (RBB) [ECF No. 7]. Accordingly, this Court may permit relation back as an equitable remedy for the mistaken dismissal of the prior case or entertain a motion to reopen the prior case under Rule 59(e) or 60(b). The Court is inclined to grant relief to remedy the erroneous dismissal of the prior case, and chooses to exercise its discretion to find the Petition timely on the basis that it relates back to the prior, timely-filed petition in So.Dist.Ca Civil Case No. 14cv2452-BEN (RBB), which was erroneously dismissed as containing only unexhausted claims.

Furthermore, even assuming relation back is unavailable, the Court finds that Respondent has waived the affirmative defense of statute of limitations by not raising it in the Answer, the first responsive pleading filed in this action. Morrison v. Mahoney, 399 F.3d 1042, 1046 (9th Cir. 2005) ("Under the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived.") The Supreme Court has held that the AEDPA statute of limitations is akin to an exhaustion requirement that could be waived by the State, and a district court has "discretion to correct the State's error" in calculating the statute of limitations provided the state has not strategically withheld or chosen to relinquish the defense and petitioner is provided the opportunity to address the issue. Day v. McDonough, 547 U.S. 198, 202-05 (2006). Respondent, one and one-half years after failing to raise the affirmative defense in the Answer, belatedly contends the waiver of the defense "was error." (ECF No. 71 at 2.) Respondent is not entitled to relief from the waiver because he provides no explanation for the "error" at all, nor disavows that it was a strategic choice to relinquish the defense in the Answer, and fails to address the erroneous dismissal of the first action or potential relief under Rules 59(e) & 60(b), but merely agrees

1  with the Magistrate Judge's conclusion that relation back is categorically unavailable in
2  this case. (Id.)

3  The Court finds the instant Petition is timely and **VACATES** the Order to Show
4  Cause.

5  **III.  Evidence Presented at Trial**

6  The following statement of facts is taken from the appellate court opinion on direct
7  appeal, which was certified for publication as to the claims alleging insufficient evidence,
8  failure to properly instruct on causation, refusal to instruct on second degree murder as a
9  lesser included offense of first degree felony murder, and the confrontation claim involving
10 a non-examining nurse testifying as to the results of an examining nurse. People v. Huynh,
11 212 Cal.App.4th 285 (Cal.App.Ct. Dec. 20, 2012). The Court defers to state court findings
12 of fact and presumes they are correct. Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

13  *Prosecution's Case*

14
15      In January 2008, Dane Williams, 23, started working for Hurley
    International, a clothing company based in Orange County. By all accounts,
16  Williams was heterosexual. The company was taking part in an industry trade
    convention in San Diego toward the end of the month. Williams drove a
17  company bus to San Diego on the Wednesday before the convention was to
    start. On the night of January 25, a Friday, Williams went to nightclubs/bars
18  with his friends and coworkers in the Gaslamp district of downtown San
    Diego. Brandon Guilmette, who was a longtime friend of Williams and a
19  Hurley coworker, left the group at 1:00 a.m. to return to the Marriott Hotel.
20  According to Guilmette, Williams had several cocktails, but was "pretty put
    together still." Others in the group also said that Williams appeared in control
21  of himself at that time despite his drinking.
22

23      However, about an hour later, a Hurley senior designer saw Williams
    in front of the Marriott Hotel and he appeared "discombobulated" or
24  "(d)efinitely intoxicated." About 2:20 a.m., a woman saw Williams, who was
    alone and swaying, in front of the hotel. The woman, who did not know
25  Williams, said he appeared to be "drugged"; he was unbalanced and fell
26  facedown. When the woman attempted to assist him, Williams stood up,
    leaned against a wall, and then staggered off. The woman said Williams was
27  unable to speak.
28

Williams did not return to his hotel room and did not show up for work the next day.

Williams's body, which was lying facedown and rolled in a blanket, was found in an alley in the Mid-City area on Tuesday, January 29, about 6:30 a.m. Williams was wearing the same clothes he had been wearing the night he disappeared, but his underwear and his watch were missing. Also, a beanie cap was on top of Williams's head; Williams had not been wearing the beanie cap the night he disappeared.

Semen belonging to someone other than Williams was found on his shirt. Dog hairs were on the blanket that was wrapped around Williams's body. A hair found on Williams's shoe was not his. Carpet fibers were on Williams's clothing. Police saw tire tracks from a van next to the body.

On January 30, Deputy Medical Examiner Othon Mena, M.D., performed an autopsy on Williams. Williams had been dead for one to three days before his body was found. The autopsy revealed lividity in Williams's upper chest area, and a "significant" amount of blood and fluid in Williams's lungs and airways. Williams's lungs were congested and weighed twice their normal weight, which can suggest cardiac death or death from asphyxiation. However, there was no evidence of strangulation, no physical signs of asphyxiation and no evidence of a cardiac event. The autopsy also disclosed a 60 percent blockage of one of the main arteries leading to Williams's heart, but Dr. Mena opined that this narrowing alone was not the cause of Williams's death. There was no trauma to Williams's anus or rectum. Toxicology tests results showed a blood-alcohol level of between 0.17 percent and 0.21 percent. Williams's blood also contained a therapeutic level (0.36 mg/L) of diazepam, a benzodiazepine drug. [Footnote: The benzodiazepine class of drugs is, like alcohol, a central nervous system depressant, commonly used as a tranquilizer. Alcohol and benzodiazepines have an additive effect when used together. In addition to diazepam, another generic benzodiazepine is clonazepam. Brand names for benzodiazepines include Rivotril, Klonopin, Xanax and Valium.] Trace amounts of diazepam were also found in Williams's gastric contents. According to Mena, the levels of alcohol and diazepam were insufficient to have caused Williams's death, but played a role in the death. (See fn. 2, *ante*.) [Footnote: The county's chief medical examiner, as well as experts called by both parties, agreed that although the combination of diazepam and alcohol did not cause the death of Williams, it played an important role.]

Dr. Mena could not determine the cause or manner of Williams's death and listed them as "undetermined" in his autopsy report. [Footnote: Dr. Mena's testimony as well as that of experts called by each party will be further addressed below in the Discussion portion of this opinion. (See pt. I., *post*.)] At trial, Mena opined the most likely cause of death was asphyxiation by a person or from the position Williams was in.

Williams's death remained unresolved for 18 months.

On Saturday, June 6, 2009, Jeremiah R., a heterosexual Navy corpsman who was recently assigned to Camp Pendleton, visited downtown San Diego. [Footnote: Jeremiah testified at Huynh's preliminary hearing in December 2009, but did not testify at Huynh's trial. The preliminary hearing testimony was videotaped and portions of the videotape were played for the jury. (See pt. XI., *post*.)] While walking around the Gaslamp district, Jeremiah encountered Huynh, who asked for a cigarette and introduced himself as "Phil." Huynh asked Jeremiah if he wanted to go to "strip clubs" and offered to pay for a lap dance, but Jeremiah declined. When Huynh mentioned he had a rental car and asked if Jeremiah wanted to go somewhere else, the corpsman said he wanted to see the local beaches. Before arriving at Ocean Beach, Huynh bought two pint-size bottles of cognac at a liquor store. Jeremiah consumed a pint of cognac while at Ocean Beach. Huynh told Jeremiah that he had recently moved to San Diego after a divorce. Jeremiah assumed Huynh was a heterosexual by the way he acted.

When Jeremiah mentioned he had a headache, Huynh gave him one or two pills from a Tylenol bottle, which was inside the car. Huynh then drove to Mission Beach with Jeremiah. Other than playing basketball at Mission Beach, Jeremiah's recollection of the rest of the night was hazy. He remembered he felt intoxicated, but did not think it was from the cognac.

Jeremiah agreed to go to Mexico with Huynh, but had no recollection of going to Mexico. Jeremiah believed he went to Mexico because a photo in his cell phone showed him standing under a "Mexico" sign on the Mexican side of the border.

Jeremiah remembered going to Huynh's residence, where he watched television in the living room before "crash(ing)" on the bed in Huynh's bedroom; Jeremiah was fully clothed. When Huynh tried to wake him up, Jeremiah said he wanted to go back to sleep. At the time, Jeremiah also heard Huynh talking to someone else.

The next day—Sunday, June 7—Jeremiah was back at Camp Pendleton, but he did not recall how he arrived there, other than being on a bus and hitting his nose when the bus driver made a quick stop. Jeremiah was missing his underwear and his pocketknife. Jeremiah felt "strange" and disoriented, and he was slurring his words. A supervising corpsman took Jeremiah to the emergency room on the base. The emergency room doctor ordered a drug screen, which came back positive for benzodiazepine. Because he was concerned that Jeremiah might have been drugged by someone, the doctor told the nursing staff to contact the San Diego Police Department.

On June 8, Jeremiah underwent a SART examination, which showed (1) his anus had abrasions and lacerations, including two open wounds, and (2) the end of the anal canal was red, which is not normal, and swollen, which indicated trauma to the rectum. The SART nurse flossed Jeremiah's teeth and took swabs from his mouth, anus, rectum, penis and scrotum; these were provided to the police, along with Jeremiah's blood and urine samples.

A police forensic analyst ascertained that the scrotal, anal and rectal swabs, as well as dental floss from Jeremiah's mouth, contained semen that did not belong to Jeremiah. Based on the semen, a DNA analyst generated a DNA profile, which was placed in a law enforcement database. This DNA profile matched the foreign DNA profile of the semen found on Williams's shirt 18 months earlier.

The level of clonazepam in Jeremiah's blood was 33 nanograms per milliliter. A therapeutic blood level of clonazepam is between 16 and 30 nanograms per milliliter. However, the metabolite (breakdown) of clonazepam was 128 nanograms per milliliter. Therefore, if Jeremiah had ingested the drug around midnight of June 6, the blood level of the drug would have been about twice the level that was detected—an amount substantially in excess of a high therapeutic dose.

Police used Jeremiah's cell phone records to track down Huynh. Jeremiah selected Huynh from a six-pack photographic lineup.

On September 10, police stopped and arrested Huynh as he was driving an Infiniti that was registered to him. Police found prescriptions and receipts from Mexico for Rivotril (see fn. 2, *ante*) in Huynh's wallet and a pill crusher in a bag on the floor of the vehicle. Inside the side pocket of the driver's side door there were two prescription bottles of Viagra and one prescription bottle of Ambien.

11

Police also searched the car of Huynh's mother, a Subaru, which Huynh had been driving earlier that day. Police found Huynh's pay stubs, mail, receipts for diazepam and Abilify prescriptions, four Mexican pharmacy receipts and prescriptions for Rivotril, which were purchased between March and October 2008. Also in the Subaru were bank statements, including one showing a September 2008 withdrawal of money in Tijuana, and rental documents of a Dodge minivan from Enterprise-Rent-A-Car dated January 28, 2008. Police also found a list of pornographic movie titles, including "Straight Buddy Seduction," "Straight Meat, Hung and Full of Cum," and "Straight Buddy Sex."

Police searched the residence at 5360 1/2 Wightman Street, where Huynh and his mother lived. In Huynh's bedroom, police found a book about homosexuality in the military and homosexuals who are interested in men in the military. Also in the bedroom was a lockbox, which contained two watches that did not belong to Huynh. In the kitchen, police also found 12 empty prescription bottles in Huynh's name for, among other drugs, Viagra, Levitra, clonazepam, and diazepam. The prescription bottle for diazepam indicated the prescription was filled on January 25, 2008.

An FBI forensic computer expert examined a computer which police confiscated from the Huynh residence. The expert found a Yahoo user profile that had been set up as "I like str8 guys 2." The expert also found numerous craigslist postings from "Ph" using various e-mail addresses including "dhuyhn20@cox.net." One post read: "I work down at Adelita's. I like masculine guys. Come to TJ and see me some time. The beer is on me." The expert also found a response to a craigslist posting about Tijuana in which "Phil" using an e-mail address of "dhuyhn20@cox.net," wrote he would "pay for everything, clubs, titty bars." Some of the e-mails included photographs of Huynh. In one of these photographs, there was a blanket similar to the one in which Williams's body was wrapped.

Police also found documents in the residence which indicated that Huynh attended the Kirksville College of Osteopathic Medicine for two years. Among the classes Huynh took there was a course in pharmacology, which included the study of the benzodiazepine class of drugs. The chairman of the pharmacology department at the college testified that students in the course learned that benzodiazepines can create an "amnesia-like" state and can lead to unconsciousness and loss of any ability to resist. Additionally, the pharmacology students learned that if alcohol is ingested as well, these effects are intensified.

After Huynh was arrested, police took a DNA swab from his mouth. The DNA was profiled and compared to the DNA evidence collected from Williams and Jeremiah.

Huynh's DNA was found on the sperm fraction of the DNA on Williams's shirt. The probability of someone at random matching that profile is one in 990 quintillion Caucasians, one in 4.5 sextillion African-Americans and one in 6.6 sextillion Hispanics. [Footnote: Probability statistics for DNA comparisons are typically based on these three major racial groups. The statistics for Asians would be lower, but not significantly.] Huynh's DNA was found on the beanie cap. The probability of someone at random matching that profile is one in 19 million Caucasians, one in 120 million African-Americans and one in 110 million Hispanics. The DNA profile from a hair found on Williams's shoe matched the DNA profile of Huynh's mother. DNA analysis also showed that hairs found on the blanket which was wrapped around Williams's body belonged to Huynh's dog. The probability of a random dog's DNA matching the DNA from the dog hairs on the blanket is one in 2.4 trillion. Fibers found on Williams's clothing matched the fibers of the carpet located in Huynh's residence.

Tire tracks found next to Williams's body matched the tires, wheel base and front wheel drive system of the Dodge minivan that Huynh had rented on the day before Williams's body was found. Fibers found on Williams's clothes matched the carpet fibers of the van that Huynh had rented.

Huynh's DNA was found in the sperm fraction of the DNA collected from Jeremiah's penis, scrotum and anus. The probability of someone at random matching that profile is one in 990 quintillion Caucasians, one in 4.5 sextillion African-Americans and one in 6.6 sextillion Hispanics, with a slightly lower figure for Asians.

In 2006, an adult video company hired Huynh to perform computer work for the company. Huynh told one of the company's owners that he liked "(y)oung, straight" men and wanted to have anal sex with them. Huynh also said he picked up young heterosexual men, many of whom were in the military, offered to buy them drinks and prostitutes in Tijuana, took them to a Tijuana bar to get them drunk, slipped pills into their drinks, brought them to a hotel and had sex with them when they passed out.

In January 2011, representatives of the San Diego County District Attorney flew to Chicago to interview Ryan R. in connection with the Huynh case. Ryan, a San Diego native, had relocated to Chicago in 2009. In 2007,

Ryan, then 19 years old and a recent high school graduate, worked as a video editor for the same company that employed Huynh. The company also paid Ryan to be filmed masturbating. Ryan and Huynh often had lunch together, and Ryan believed Huynh to be a heterosexual like himself. Huynh frequently invited Ryan to accompany him to Mexico and offered to pay for drinks and girls. The two owners of the video company had warned Ryan that Huynh liked to take young men to Tijuana, where he would get them drunk, "slip" them drugs and then sexually assault them. But Ryan did not believe the owners. One night Ryan phoned Huynh because he was bored. Huynh suggested they go to a "titty bar" in Tijuana, and Huynh took Ryan to a strip bar called "Purple Rain." Huynh bought Ryan three or four beers and suggested they rent a hotel room to use as their "home base." Once in the hotel room, Huynh placed a pill in a bottle of water and offered it to Ryan, who at first declined to drink from the bottle. Because Ryan had "a guard up," he asked Huynh to drink from the bottle first. Ryan could not remember the rest of the evening. He woke up the next morning facedown on a hotel bed with his shirt off and his pants undone. Ryan felt "hung over," but not like one would feel from drinking too much alcohol. He also felt like he had been sodomized. Ryan looked for Huynh, but could not find him.

Also, after Huynh's arrest was reported in news media, three other young men, all heterosexual, contacted police about their experiences with Huynh.

In April 2008, Maksim I. was clubbing in downtown San Diego with his wife and a friend. While his wife and friend were waiting in a line to get into a nightclub, Maksim walked to a nearby store, where Huynh approached him, and the two talked. Maksim returned to his wife and friend at the club. After his wife left with her friends, Maksim and his friend went to another bar. Huynh was at this bar. When the bar closed, Maksim and his friend went outside, where they saw Huynh. The three of them started talking about Mexico and Huynh's offer to pay for the "girls." Maksim and his friend agreed to go with Huynh and the three went to Adelita's in Tijuana. Maksim's friend was feeling ill and decided to go home. After Maksim drank two beers, he and Huynh went to a hotel room. Waiting in the hotel room for girls to arrive, Maksim said he was thirsty and Huynh gave him a Sprite soft drink. Maksim's next memory was waking up in the hotel room at 4:00 p.m. the next day; the door to the room was open. Maksim's debit card and watch were missing. At trial, Maksim testified he felt numb, disoriented and confused. Maksim also identified one of the watches from the box in Huynh's residence as the one he had been wearing that night.

On May 24, 2009, Fernando P., a 21-year-old sailor in the Navy, was drinking rum in the Gaslamp district when Huynh approached and started a conversation. Huynh told Fernando he was divorced and was going to go to strip clubs in Tijuana. Huynh invited Fernando to accompany him and offered to pay for drinks and strippers. Fernando, who thought Huynh was interested in women, accepted the invitation. At Adelita's, Huynh bought beers. Fernando soon began to feel strange and when he mentioned this, Huynh said it was time to go to the hotel room because the girls were on the way. Huynh repeatedly told Fernando to take a Viagra pill, and in the hotel room Huynh attempted to force Fernando to do so. Fernando felt dizzy, weak and nauseated, but pushed Huynh away and ran out of the hotel room. He ran until he fell into a ditch. Fernando spent two days in a hospital in a coma; he had arrived at the hospital shirtless.

On Friday, August 21, 2009, David G., a 25-year-old college student who lived in downtown San Diego, was drunk when he went looking for some late-night food. Huynh walked up to David and said, "Hey, what's up?" Huynh also said he wanted to go to Mexico and invited David to accompany him, saying he would pay for everything. David agreed. At Adelita's in Tijuana, Huynh said he wanted Ecstasy and Viagra, but David said he did not take drugs. At one point, Huynh went to the bar and returned with an open beer bottle for David. Huynh then said he had a room and "girls" would "come over." After walking out of Adelita's, David blacked out. He awoke the next day in a hotel room. The door was ajar and David was fully clothed, but had scratches on his arm and shoulder. David felt horrible, dizzy and confused. At trial, David identified one of the watches that police found in the box in Huynh's residence as the watch he had been wearing on the night he met Huynh.

*Defense Case*

About 2:00 a.m. on January 26, 2008, a coworker encountered Williams near the Marriott Hotel. Williams, who was "pretty out of it," suggested they "'do something.'" The coworker was tired and went to his hotel. [¶] The defense also presented evidence that Williams's body was left in the alley between 9:00 p.m. and 10:00 p.m. on January 28, 2008.

Roger Miller, a DNA expert, testified the eight sperm cells found in Williams's anal swab were not significant because there was insufficient genetic material to perform DNA testing. Miller also said the sperms cells could belong to Williams because sperm is easily transferred. Miller added he would expect to find sperm cells in 100 percent of men's underwear. Miller

also discounted the notion that the sperm found in Williams's anus belonged to Huynh simply because Huynh's sperm was found on Williams's shirt. [¶] Although sperm was found on David G.'s shirt, the DNA profile obtained from the sperm matched David's own DNA profile and excluded Huynh.

A physician from Sharp Chula Vista Medical Center testified that when Fernando P. was brought to the hospital, his blood-alcohol level was 0.23 percent. Fernando P. was so intoxicated he had to be intubated and placed on a ventilator. A toxicology screen did not reveal any drugs in his system. [¶] The defense also presented the testimony of three pathology experts, which will be discussed below. (See fn. 4, *ante*.)

People v. Huynh, 212 Cal.App.4th at 291-98.

## IV.   **PETITIONER'S CLAIMS** [3]

(1)   Insufficient evidence exists to support the murder conviction because the cause of death was never proven and recently discovered evidence points to a natural cause of death, or to support the oral copulation and sodomy counts because there is no evidence linking Petitioner to those crimes, no evidence Williams was alive when sexually assaulted, and no evidence he was orally or anally penetrated. (ECF No. 1 at 6; ECF No. 1-1 at 3-9.)

(2)   Petitioner is actually innocent based on "diligently discovered scientific evidence presented herein [which] undermines the prosecution's entire case and points to petitioner's innocence." (ECF No. 1 at 7; ECF No. 1-1 at 8.)

(3)   Petitioner received ineffective assistance of trial counsel in violation of the Sixth Amendment due to: (a) a conflict arising from a hostile and uncommunicative relationship, and (b) counsel's failure to (i) request a change of venue, (ii) point out evidentiary discrepancies to the jury, (iii) request a jury instruction, (iv) present evidence of third party guilt and improper handling of DNA testing samples, (v) object to inflammatory

---

[3]   "The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of *pro se* litigants." Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987), quoting Boag v. MacDougall, 454 U.S. 364, 365 (1982); see also Zichko v. Idaho, 247 F.3d 1015, 1020 (9th Cir. 2001) (holding that liberal construction of *pro se* prisoner habeas petitions is especially important with regard to which claims are presented). The claims as addressed herein is based on such a construction of the *pro se* Petition.

15cv1924-BTM (AGS)

1  statements, and (vi) investigate Petitioner's mental health for use at trial as a defense and
2  at sentencing as mitigation. (ECF No. 1 at 8; ECF No. 1-1 at 3-5, 7-8, 11-12.)

3      (4) Petitioner's right to due process under the Fifth and Fourteenth Amendments
4  was violated by: (a) allowing the sex offenses to be used as propensity evidence, (b) jury
5  instructional errors, (c) a biased judge, (d) inability to confront witnesses, and (e) the
6  cumulative effect of the errors. (ECF No. 1 at 9; ECF No. 1-1 at 4, 6-12.)

7      (5) Petitioner's right to be free from an unreasonable search and seizure under the
8  Fourth Amendment was violated by a second, warrantless search of his home, during which
9  the watches introduced against him were seized. (ECF No. 1 at 9; ECF No. 1-1 at 4, 6.)

10  **V.  DISCUSSION**

11      As set forth herein, the Court finds, as to those claims which were adjudicated on
12  the merits in state court, that federal habeas relief is not available because the state court
13  adjudication is neither contrary to, nor an unreasonable application of, clearly established
14  federal law, nor based on an unreasonable determination of the facts. As to the remaining
15  claims, the Court finds, based on a de novo review, that habeas relief is unavailable because
16  Petitioner has not alleged facts which, if true, establish a federal constitutional violation.
17  The Court finds appointment of counsel, discovery, and an evidentiary hearing are
18  unwarranted, and issues a Certificate of Appealability limited to the claims set forth below
19  in the conclusion.

20  ///

21      **A.  Standard of Review**

22      In order to obtain federal habeas relief with respect to a claim which was adjudicated
23  on the merits in state court, a federal habeas petitioner must demonstrate that the state court
24  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an
25  unreasonable application of, clearly established Federal law, as determined by the Supreme
26  Court of the United States; or (2) resulted in a decision that was based on an unreasonable
27  determination of the facts in light of the evidence presented in the State court proceeding."
28  28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, a petitioner must show

a federal constitutional violation occurred in order to obtain relief. <u>Fry v. Pliler</u>, 551 U.S. 112, 119-22 (2007); <u>Frantz v. Hazey</u>, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407. In order to satisfy § 2254(d)(2), the factual findings relied upon by the state court must be objectively unreasonable. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

When a federal habeas court addresses a claim which has not been adjudicated on the merits in state court, pre-AEDPA de novo review is required. <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167-68 (9th Cir. 2002). Under such a review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." <u>Hayes v. Brown</u>, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). The state court's reasoning on any related claim must be considered. <u>Frantz</u>, 533 F.3d at 738 (holding that where the reasoning of the state court is relevant, it must be part of a federal habeas court's consideration even under de novo review).

**B. Claim One**

Petitioner alleges in claim one, as he did on direct appeal, that his federal due process rights were violated because insufficient evidence supports the murder conviction and the oral copulation and sodomy of an intoxicated person convictions as to the murder victim. (ECF No. 1 at 6; ECF No. 1-1 at 3-11, citing <u>Jackson v. Virginia</u>, 443 U.S. 319 (1979) (holding that the Fourteenth Amendment's Due Process Clause is violated, and an applicant

is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.").) Petitioner contends the state court applied a "reasonable probability" standard rather than proof beyond a reasonable doubt as to the element of death by criminal agency, and that a reasonable doubt exists as to whether he caused Williams' death because the evidence shows Williams had a potentially fatal heart condition which can cause sudden death, and the jury's finding he caused Williams' death is "based on conjecture, guesswork, and unverifiable possibilities." (ECF No. 1-1 at 3-11.) He alleges there was no evidence linking him to a sexual assault on Williams, no evidence Williams was alive when he was sodomized or orally copulated, and no evidence Williams was orally or anally penetrated. (Id.) In an aspect of this claim not presented to any state court, Petitioner claims that insufficient evidence was presented to support the oral copulation and sodomy convictions involving Jeremiah. (Id. at 4.)

Respondent answers that the state court adjudication of claim one is neither contrary to, nor an unreasonable application of, Jackson v. Virginia, because, despite the fact that the state appellate court applied a "reasonable probability" standard regarding proof of death by criminal agency, viewing the evidence in the light most favorable to the prosecution and presuming the jury resolved any conflicting inferences against Petitioner, a rational jury could have found beyond a reasonable doubt that Petitioner was responsible for Williams' death. (ECF No. 16-1 at 9-10.)

Petitioner presented this claim as it applies to the murder victim to the appellate court on direct appeal. (ECF No. 12-2 at 44-59.) The court denied the claim on the merits in a written opinion published in part as to this claim. People v. Huynh, 212 Cal.App.4th at 298-303. It was then presented to the state supreme court in a petition for review (ECF No. 12-9 at 15-22), which was denied with an order which stated: "The petition for review is denied." (ECF No. 83-2, People v. Huynh, No. S208162, order at 1 (Apr. 10, 2013).)

///

///

The Court will apply the provisions of 28 U.S.C. § 2254(d) to the last reasoned decision with respect to claim one, the state appellate court opinion.[4] Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground."); Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005) ("When more than one state court has adjudicated a claim, we analyze the last reasoned decision.") The state appellate court on direct appeal stated:

> Huynh contends his murder conviction must be reversed because there is insufficient proof of death by criminal agency. The contention is without merit.
>
> Because Huynh's contention is based on conflicting medical evidence presented at trial, we begin by relating the medical testimony in more detail.
>
> In responding to hypothetical questions by the prosecution, Dr. Mena said that a penis placed in a person's mouth could make it more difficult to breathe and could cause that person's death if he or she had a 0.17 percent blood-alcohol level and had ingested benzodiazepine as well. [Footnote: Dr. Mena responded similarly when the prosecutor changed the hypothetical from a penis in a person's mouth to situations in which (1) the person is lying facedown while being sodomized, (2) someone is sitting on the person's chest, or (3) the person's neck is turned while he was being sexually assaulted.] Mena also testified that if he had known that Huynh gave Williams benzodiazepine and sexually assaulted Williams, he would have changed the cause of death to "sudden death during or around the time of sexual assault while intoxicated" and changed the manner of death to homicide.

---

[4] After this claim was denied on direct appeal, Petitioner presented it in his state habeas petition which was denied on procedural grounds. A claim denied on the merits on direct appeal and raised in a later state post-conviction proceeding and denied on procedural grounds is not procedurally defaulted. See Koerner v. Grigas, 328 F.3d 1039, 1049-53 (9th Cir. 2003) ("A claim cannot be both previously litigated and procedurally defaulted.") To the extent Petitioner relied on additional evidence in the state habeas petition not presented on direct appeal, as seen below, the new evidence does not render it unexhausted. See Aiken v. Spalding, 841 F.2d 881, 884 n.3 (9th Cir. 1988) (holding that new facts may render an exhausted claim unexhausted when it "places [the] claim in a significantly different and stronger evidentiary posture that it had when presented in state court.")

In addition to Dr. Mena's testimony, the prosecution presented the expert testimony of Jonathan Benumof, M.D., an anesthesiologist and cardiovascular specialist who opined the cause of Williams's death was an "external obstruction to breathing." [Footnote: Dr. Benumof is not a pathologist and has not performed an autopsy other than in medical school. Benumof testified he reviewed Dr. Mena's report and his testimony at the preliminary hearing, he did not, however, view any of the autopsy photographs or slides.] Pointing to the excessive postmortem weight of Williams's lungs, Dr. Benumof concluded there was a "complete" obstruction to breathing, which had caused "negative pressure pulmonary blood and edema." Benumof also opined the combination of alcohol and diazepam contributed to Williams's death by "hamper(ing) any effective opposition (Williams) would have mounted" against the external obstruction to his breathing. Benumof did not know what the obstruction to Williams's breathing was, but opined that a penis in his mouth could have caused such a complete obstruction.

The defense presented the testimony of Glenn Wagner, M.D., the chief medical examiner for San Diego County, and Christopher Swalwell, M.D., a deputy medical examiner. Both doctors testified that there was a consensus in the office that the cause and manner of Williams's death were "undetermined." Further, the consensus did not change after prosecutors and police provided the office with additional information, including the prosecution's theory that (1) Huynh had drugged Williams with benzodiazepine and sexually assaulted him, and (2) Huynh's DNA was found on Williams.

Dr. Wagner also testified the medical examiner's office is usually disinclined to classify the cause and manner of death as "undetermined." Wagner said Williams's death was one of those unusual cases where medical examiners are unable to determine what happened despite a comprehensive autopsy and attention to physical detail. [Footnote: In answering a hypothetical posed by the prosecution, Dr. Wagner opined that if it were established that Huynh gave Williams benzodiazepine and sexually assaulted him, Wagner would agree with Dr. Mena the cause of death should be changed to sudden death during sexual assault and the manner of death should be changed to homicide.]

The defense also presented the expert testimony of Todd Grey, M.D., the chief medical examiner for Utah, who opined Dr. Mena did a thorough examination of Williams's body and provided a well-reasoned autopsy opinion. Grey testified he agreed with Mena's certification of the cause and

manner of Williams's death as "undetermined." Grey opined the 60 percent occlusion of Williams's coronary artery is rare for a 23-year-old person and possibly played a role in the death. Grey said the blockage possibly caused Williams's death from a heart attack that could not be ascertained postmortem. Grey said other possible causes of Williams's death include a lethal seizure, cardiac arrhythmia, suffocation and the combined effects of alcohol and diazepam in his system leading to a suppression of respiration or a "diminution of his drive to breathe."

Dr. Grey also criticized Dr. Benumof's opinion that Williams died from a total obstruction of his airways. Grey said congested lungs that are full of fluid are present in other types of deaths. Grey testified a medical examiner does not properly determine the cause of death based on the weight of the decedent's lungs and the fact they were congested because such findings do not prove airway obstruction. Edema and frothy fluids can be present in "all kinds of different situations and causes of death," including "slow cardiac deaths" and "respiratory depression." Grey also criticized Benumof's methodology and opinion in part because Benumof offered his opinion before reviewing any materials in the case, including the autopsy report.

Because all of the testifying *pathologists* and *medical examiners* (see fn. 8, *ante*) agreed the manner and cause of Williams's death were "undetermined," Huynh argues the prosecution failed to prove criminal agency - that is, the criminal act of another was the cause of death. (See *People v. Ives* (1941) 17 Cal.2d 459, 464.) The term "criminal agency" is usually used in the context of establishing the corpus delicti. "'The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm.'" (*People v. Kraft* (2000) 23 Cal.4th 978, 1057.) "In a prosecution for murder, as in any other criminal case, the corpus delicti - i.e., death caused by a criminal agency - must be established independently of the extrajudicial statements, confessions or admissions of the defendant." (*People v. Towler* (1982) 31 Cal.3d 105, 115.) [Footnote: In this regard, "(t)he purpose of the corpus delicti rule is to assure that 'the accused is not admitting to a crime that never occurred.'" (*People v. Jones* (1988) 17 Cal.4th 279, 301.) Accordingly, before a confession may be introduced, the prosecution must introduce some corroborating evidence that shows someone committed a crime. (*People v. Ochoa* (1998) 19 Cal.4th 353, 405.) The corpus delicti also serves another purpose. "'(T)he corpus delicti is a necessary element of the prosecution's case in a criminal trial. . . . Thus, a precondition to conviction is that the state prove that a 'crime' has been committed - otherwise there could not possibly be guilt, either in the accused or in anyone else.'" (*Id.* at p. 404, italics omitted.)] The corpus delicti of

15cv1924-BTM (AGS)

murder consists of the death of the victim and a criminal agency as the cause of that death. (*People v. Small* (1970) 7 Cal.App.3d 347, 354.)

It is undisputed that Williams died; hence, the only issue was whether his death was caused by the criminal act of another. The standard of proof required to show criminal agency is only a reasonable probability; in other words, only a slight or prima facie showing that the criminal act of another caused the death is necessary. (*Matthews v. Superior Court* (1988) 201 Cal.App.3d 385, 392.) "To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency (citation), even in the presence of an equally plausible noncriminal explanation of the event." (*People v. Jacobson* (1965) 63 Cal.2d 319, 327.)

The corpus delicti may be proved by direct or circumstantial evidence as well as by other acts evidence. (*Matthews v. Superior Court, supra,* 201 Cal.App.3d at p. 392.) In that regard, the fact that Williams's body was found in an alley wrapped in a blanket furnishes at least a prima facie showing of criminal agency, inasmuch as the bodies of victims of accidental deaths typically would not be disposed of in this manner. (*People v. Kraft, supra,* 23 Cal.4th at p. 1057.) An inference of criminal agency in connection with Williams's death is therefore reasonable. Likewise, one could reasonably infer criminal agency by the other acts evidence - namely, that Huynh's modus operandi was to drug young, heterosexual males and then sexually assault them. (*Matthews v. Superior Court, supra,* at pp. 392-393.) Other evidence leading to a reasonable inference of criminal agency includes the semen in the anus and mouth of Williams, a heterosexual; Huynh's semen on Williams's shirt; hair from Huynh's mother and dog on the body; the diazepam in Williams's body and the prescription receipts for the drug found in Huynh's car; Huynh having taken a college course on the effect of drugs, including diazepam; and the tire tracks from Huynh's rental van matching the tire tracks found in the alley where the body was found.

Huynh argues that Dr. Benumof's testimony should be disregarded because he is not a forensic pathologist and his opinions were based on speculation, guesswork and conjecture. However, it is up to the jury - not an appellate court - to determine what weight to give to the testimony of an expert witness. (*People v. Rittger* (1960) 54 Cal.2d 720, 733.) Also, Huynh ignores the hypothetical questions posed by the prosecution to Dr. Mena and Dr. Wagner and the doctors' answers. (See fn. 7 & accompanying text, fn. 9,

*ante*.) The hypothetical questions and answers were within the scope of proper expert testimony. (*People v. Sims* (1993) 5 Cal.4th 405, 437.)

More significantly, we reject Huynh's implicit notion that an inconclusive autopsy necessarily results in a failure to establish criminal agency, which is at the core of his argument. Case law shows Huynh is mistaken.

In *People v. Towler, supra,* 31 Cal.3d at pages 112 and 113, the murder victim was found on the banks of the Stanislaus River two months after he disappeared. The deterioration of the victim's body precluded the examining doctors from determining the cause of death. (*Id.* at p. 113.) The doctors discounted the cause of death as being from a gunshot, stabbing or strangulation, but were unable to exclude a drug overdose, suffocation or drowning. (*Ibid.*) The defense presented evidence suggesting the victim could have died accidently after using the drug PCP. (*Id.* at pp. 113-114.) Our Supreme Court rejected the defendant's argument that without his extrajudicial statements the evidence was insufficient to establish the victim's death was the result of a criminal agency. (*Id.* at pp. 115-117.) "Although the medical testimony was inconclusive, there was a considerable amount of additional evidence, exclusive of Towler's statements, from which it was reasonable to infer that Stone's death could have been caused by a criminal agency." (*Id.* at pp. 115-116.) Among other things, the Supreme Court noted the victim (1) was a police informant who associated with people involved in illegal drug sales and some of them knew of or suspected his informant role; (2) apparently was worried about his own safety as evidenced by his telling a coworker to contact the police if he did not show up for work; (3) disappeared suddenly without telling anyone where he was going; (4) apparently was taken to the remote river location because he had no vehicle; and (5) was found in the same new clothes he had obtained for his position of assistant manager of a restaurant - an outfit he presumably would not wear for a camping trip to the river. (*Id.* at p. 116.)

"All of this evidence, of course, did not rule out the possibility that Stone had died from noncriminal causes. As noted, however, the corpus delicti rule is satisfied 'by the introduction of evidence which creates a reasonable inference that death could have been caused by a criminal agency . . . even in the presence of an equally plausible noncriminal explanation of the event.' (Citation.) We conclude that the evidence is sufficient to support a reasonable inference that death could have been caused by a criminal agency." (*People v. Towler, supra,* 31 Cal.3d at p. 117.)

In *People v. Jacobson, supra,* 63 Cal.2d at page 327, the parties presented conflicting medical evidence about whether the drowning death of a 21-month-old child was accidental. Our Supreme Court found the conflict in medical testimony did not rule out a finding of criminal agency. (*Ibid.*) "With two possible contrary inferences before it, the court did not err in ruling that a prima facie showing of corpus delicti had been made. To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency (citation), even in the presence of an equally plausible noncriminal explanation of the event." (*Ibid.*)

In *People v. Johnson* (1951) 105 Cal.App.2d 478, 483, the doctor who performed the autopsy testified that the fatal gunshot wound could have been self-inflicted because of the position of the entry of the projectile. The doctor also testified that no visible powder burns were on the victim's body. (*Ibid.*) Notwithstanding the inconclusive autopsy evidence on the cause and manner of death, the appellate court found the testimony of a woman living in the apartment directly below the victim's apartment was sufficient to establish criminal agency. (*Id.* at pp. 480, 484-485.) The woman testified that she heard a scream and someone say: "'"No Ernest, no, don't, don't"' (-) something to that effect." (*Id.* at p. 480.) The witness continued: "'. . . I heard another scream and a thud.'" (*Ibid.*) The appellate court noted: "The outcry, identified as Mrs. Johnson's, was strong circumstantial evidence of an assault or threat of violence of sufficient gravity to evoke the screams and the pleading cry followed by another scream, from which an inference of suicide could not reasonably be drawn." (*Id.* at p. 484.) "(T)he outcry and screams . . . (a)t the very least . . . showed 'a reasonable probability' that the criminal act of another was the cause of death." (*Id.* at p. 485.)

People v. Huynh, 212 Cal.App.4th at 298-303.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. The Court must apply an additional layer of deference in applying the Jackson standard,

and "must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' <u>Jackson</u> and <u>Winship</u> to the facts of this case." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005), quoting 28 U.S.C. § 2254(d)(1).

The evidence from which Petitioner's jury could have drawn a reasonable inference that Williams died as a result of being sodomized or orally copulated by Petitioner while intoxicated included: (1) semen was found in Williams' mouth and anus, and Petitioner's semen found on Williams' shirt, despite Williams being a heterosexual, (2) Williams was found without his watch and a watch which did not belong to Petitioner was recovered from Petitioner's bedroom, (3) diazepam was found in Williams' blood, and Petitioner possessed diazepam and had taken a medical course regarding its effects, and (4) forensic evidence connected Petitioner to the clothing and cap Williams was wearing, the blanket in which his body was wrapped, and carpet fibers from a van Petitioner rented, which also matched tire tracks near Williams' body. In addition, there was evidence Petitioner had a modus operandi of drugging and sexually assaulting young heterosexual men, consisting of: (1) his statement to his two employers that he enjoyed drugging young heterosexual men so he could sexually assault them, (2) pornographic material found in his car and bedroom showing an interest in homosexual contact with heterosexual men, and internet postings found on his computer offering to pay for trips to strip clubs with such men; (3) testimony from Ryan R. that he had been warned by Petitioner's employers that Petitioner liked to take young men to Tijuana where he would drug them and have sex with them after they passed out, which happened to Ryan when he accompanied Petitioner to Tijuana; and (4) trial testimony from victim Jeremiah and three other young heterosexual men who came forward with similar stories of encounters with Petitioner, one of whom identified his missing watch as among those found in Petitioner's bedroom.

The jury could have reasonably inferred from that evidence that Petitioner drugged Williams, orally copulated or sodomized him, and disposed of his body after he died during their encounter. However, Petitioner maintains that the evidence did not establish beyond a reasonable doubt that he *caused* Williams' death. Rather, he contends he can show

15cv1924-BTM (AGS)

Williams suffered from "a potentially fatal condition known as left ventricular hypertrophy that can cause arrhythmia and sudden death." (ECF No. 1-1 at 3.)

Dr. Othon Mena, the Deputy San Diego County Medical Examiner who performed the autopsy on Williams, testified that he is required in every case to assign a manner of death and a cause of death. (ECF No. 17, Reporter's Tr. ["RT"] at 756-57.) He said there are five manners of death, natural, homicide, accident, suicide and undetermined, and that the cause of death is the injury or disease which begins the sequence of events ultimately resulting in death. (Id.) Although the way Williams' body was found raised suspicions of homicide, the body appeared free of conditions or injuries which might have caused death, including the fact that Williams had a 60 percent blockage in one of the three main arteries leading to his heart, and Dr. Mena said that at the time of the autopsy he considered both the manner of death and the cause of death to be undetermined. (RT 791-94.) At trial he said he still considered the manner of death undetermined because he could not tell whether death was an accident or a homicide, but said if he knew it was true that Petitioner gave Williams benzodiazepine and sexually assaulted him he would find it to be a homicide. (RT 829-30.) He opined that positional asphyxiation was the most likely cause of death, that the drugs and alcohol in Williams' system played an important role in the asphyxiation but neither the drugs and alcohol nor Williams' heart condition by themselves caused death, and, in answering a hypothetical question, said that a penis in Williams' mouth, or having Williams' face pushed down while being sodomized, could have caused interference with his breathing sufficient to cause death. (RT 821-30.) Dr. Johnathan Benumof, an anesthesiologist and professor at the University of California, San Diego Medical Center, testified for the prosecution that in his opinion the only possible cause of Williams' death was an external obstruction to breathing which caused his lungs to fill with fluid creating a pulmonary edema that killed him within five minutes, that the combination of alcohol and drugs could not have caused the edema, and the benzodiazepine in Williams' blood prevented him from effectively struggling against the obstruction. (RT 1532, 1549, 1599.) Both he and Dr. Mena opined that the 60 percent blockage in Williams' artery did

15cv1924-BTM (AGS)

not contribute to his death, and agreed that such a blockage is only clinically significant at 70-75 percent. (RT 792-94, 1542, 1553.) That testimony, and the evidence discussed above, including the fact that semen was found in Williams' mouth and anus, is sufficient evidence from which a jury could draw a reasonable inference that Williams died while he was being sodomized or orally copulated by Petitioner as a result of his inability to resist or breathe properly due to being drugged by Petitioner.

Petitioner contends he can show that Williams' heart condition may have caused his death. However, the jury was presented with evidence that Williams suffered from a pre-existing heart condition, in that one of the main arteries leading to his heart had a 60 percent blockage, which Dr. Mena and Dr. Benumof both opined did not contribute to his death. The defense presented testimony from Dr. Todd Grey, the Chief Medical Examiner for the State of Utah, who opined that Williams could have died of natural cardiac arrest, that the combined effects of alcohol and Valium in his system could have suppressed his respiration to the point of possibly causing death, and stated that he would have certified the cause of death as undetermined because he was unable to choose between possible causes of death. (RT 3716-20.) Dr. Grey disagreed with Dr. Benumof's opinion that a 60 percent arterial blockage is not clinically significant, and said that the 70-75 percent blockage threshold considered by Dr. Benumof as clinically significant is actually critical, which means a person is at risk for sudden death or heart attack at any time. (RT 3719-20.) Dr. Grey disagreed with Dr. Benumof's opinion that Williams died of an airway obstruction because "the findings in asphyxia deaths are essentially nonspecific, meaning you can see those similar findings in other kinds of death," and said that even though he could not rule out asphyxia as a cause of death, he noted that there are many potential causes of asphyxia. (RT 3722-24.) The defense also called Dr. Glenn Wagner, the Chief San Diego County Medical Examiner, who testified that his deputy, Dr. Mena, conducted a comprehensive autopsy on Williams and initially assigned the manner of death and cause of death as undetermined. (RT 3621-23.) Dr. Wagner opined that a possible cause of death was positional asphyxia, "a situation where someone might fall asleep and be positioned in a

way where they cut off their own airway," which can happen to an intoxicated person. (RT 3636-37.) The defense also called Dr. Christopher Swalwell, the longest serving Deputy San Diego County Medical Examiner at the time of trial, who testified that he attended a meeting on July 14, 2010, where police authorities and prosecutors presented evidence to himself, Dr. Wagner, and four other Deputy San Diego County Medical Examiners. (RT 2591-92.) The meeting was called to determine whether Dr. Mena's finding that the cause of death was undetermined should be changed, and the consensus of opinion at the meeting was that it should not be changed. (RT 3593-94.)

Defense counsel admitted during closing argument that the forensic evidence established that Williams died while he was with Petitioner, after which Petitioner wrapped him in a blanket, placed a cap on his head, and placed the body in a well-trafficked alley near Petitioner's home where he was sure it would soon be found. (RT 4017-18, 4059.) Counsel argued that Petitioner did not want to call attention to himself by calling the police, "not because he is a killer but because of these other activities that we know [he] engages in," which "only tells you the level or extent of his sexual addiction or his theft crimes and it tells you nothing about how Mr. Williams died," and that the central question of the case was what caused Williams' death. (RT 4018-21.) Counsel pointed out that Williams was described as having shaky hands like an old man, was prone to headaches, had not been to a doctor in at least seven years, was drunk before he met Petitioner that night, and the sperm found in his mouth and anus could have been his own, deposited when he was masturbated by Petitioner. (RT 4053-54, 4060.) Counsel argued that for three and a half years after Williams' body was found, Dr. Mena steadfastly maintained his opinion that the cause of death was undetermined, as did six other board-certified forensic examiners in the medical examiner's office, even in the face of strong prosecution pressure to blame Petitioner, which included the hiring of an outside anesthesiologist Dr. Benumof, who counsel argued was unqualified to prescribe a cause of death. (RT 4025-35, 4048.) Defense counsel argued that Dr. Mena changed his opinion as to the cause of death the day before trial to "a made-up cause of death designed to fit the charges in this case." (RT 4029-30.)

Defense counsel concluded:

> All the prosecution has in this case are possibilities. Even the testimony of Dr. Mena that was quoted by the prosecutor was talking about possibilities. Could Mr. Williams have died by suffocation during a sodomy, if sodomy occurred? It is possible. Has it been proven? No. [¶] Could he have died by suffocation by a penis in his mouth, unlikely, but possible. Proven? No. And possibilities, as you can see, leave reasonable doubt.

(RT 4035.)

Thus, the jury was presented with the theory Petitioner now relies on, that Williams died of a preexisting heart condition or some other undetermined cause and it is pure speculation he died as a result of being orally copulated or sodomized. However, Petitioner merely points to conflicting medical opinions as to the cause of death, as he did at trial, and the jury has already resolved any conflicting inferences from that evidence against him. See Jackson, 443 U.S. at 319, 324 (holding that federal habeas courts must consider the evidence "in the light most favorable to the prosecution," and must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict). As discussed below in the actual innocence claim, Petitioner presents articles from scientific publications along with trial evidence to argue Williams could have died of natural causes related to his heart condition or that his pulmonary edema may have been triggered by something other than sexual assault. Although consideration of evidence not presented to the state court is beyond the scope of review under 28 U.S.C. § 2254(d) as to claim one, Cullen v. Pinholster, 563 U.S. 170, 181 (2011), the vast majority of Petitioner's "new" materials are either in the state court record or consist of articles from science journals predating trial, and in any case, as set forth below, his scientific literature adds nothing to, and does not call into question, the medical opinions presented to the jury. With respect to this sufficiency of the evidence claim he is not entitled to a reweighing of the evidence or a reexamination of the credibility of the witnesses, and competing inferences, however reasonable, do not support relief. See

Coleman v. Johnson, 566 U.S. 650, 656 (2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality. The state court of last review did not think so, and that determination in turn is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d)."); Schlup v. Delo, 513 U.S. 298, 330 (1995) ("under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review.")

Petitioner has failed to show that based on the "evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" that he killed Williams by the criminal act of sodomy or oral copulation of an intoxicated person. Jackson, 443 U.S. at 324; see Coleman, 566 U.S. at 651 ("Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of deference.") The additional layer of deference owed to the state court opinion under AEDPA requires this Court to inquire whether "fairminded jurists could disagree" with the state court determination that a rational trier of fact could have found sufficient evidence to support the conviction. Harrington v. Richter, 562 U.S. 86, 88 (2011), citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Sufficient evidence was presented in the state court to support the jury's finding that Petitioner criminally caused Williams' death, and the state court opinion does not reflect "an unreasonable application of Jackson and Winship to the facts of this case." Juan H., 408 F.3d at 1274-75. Neither has Petitioner demonstrated that the state court adjudication involved an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Miller-El, 537 U.S. at 340.

Petitioner has also failed to support his claim that the state court lowered the burden of proof by applying a "reasonable probability" standard regarding proof of death by criminal agency. The jury received the following instructions:

A defendant in a criminal case is presumed to be innocent. This presumption requires that the people prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the people must prove something, I mean they must prove it beyond a reasonable doubt.

(RT 3895.)

15cv1924-BTM (AGS)

To prove that the defendant is guilty of first-degree murder under [a felony murder] theory, the people must prove that, one, the defendant committed or attempted to commit sodomy of an intoxicated person in violation of penal code section 286(i), or oral copulation of an intoxicated person in violation of penal code section 288a(i); two, the defendant intended to commit sodomy of an intoxicated person in violation of penal code section 286(i) or oral copulation of an intoxicated person in violation of penal code section 288a(i); and three, while committing or attempting to commit sodomy of an intoxicated person in violation of penal code section 286(i) or oral copulation of an intoxicated person in violation of penal code section 288a(i), the defendant caused the death of another person.

(RT 3912-13.)

Dane Williams may have suffered from an illness or physical condition that made him more likely to die from an injury than the average person. The fact that Dane Williams may have been more physically vulnerable is not a defense to murder. If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death. [¶] This is true even if Dane Williams would have died in a short time as a result of other causes or if another person of average health would not have died as a result of the defendant's actions. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty.

(RT 3915-16.)

Thus, the jury was instructed that the prosecution was required to prove beyond a reasonable doubt that Petitioner's actions caused Williams' death. Although the state court found that death by criminal agency, or corpus delicti, requires a slight or prima facie showing that a criminal act caused the death of the victim, the jury was instructed that the prosecution was required to prove beyond a reasonable doubt that Petitioner's criminal act of sodomy or oral copulation, or attempted sodomy or oral copulation, of an intoxicated person, caused Williams' death. Because the jury was never instructed that any lesser burden applied to prove Williams died by a criminal act, or was asked to make such a finding, it is irrelevant for the purposes of the Jackson inquiry that a lesser threshold burden of proof to show corpus delicti exists under state law. See Coleman, 566 U.S. at 655 ("Under Jackson, federal courts must look to state law for the substantive elements of the

1  criminal offense; but the minimum amount of evidence that the Due Process Clause
2  requires to prove the offense is purely a matter of federal law.")

3      Petitioner next contends insufficient evidence supports his convictions of sodomy
4  and oral copulation of an intoxicated person regarding Williams, claiming there was no
5  evidence linking him to those crimes, no evidence Williams was alive when assaulted, and
6  no evidence of oral or anal penetration.  The state appellate court denied the claim:

7      Huynh contends the oral copulation and sodomy convictions involving
   Williams were not supported by substantial evidence.  Specifically, Huynh
8  points to a lack of evidence (1) linking Huynh to the semen found in
   Williams's mouth and anus, (2) showing Williams was alive when he was
9  sodomized and orally copulated, and (3) establishing the requisite penetration
10  of the anus or mouth of Williams.  The contention is without merit.

11
       Section 286, subdivision (i) criminalizes "an act of sodomy, where the
12  victim is prevented from resisting by an intoxicating or anesthetic substance,
13  or any controlled substance, and this condition was known, or reasonably
   should have been known by the accused." (*Ibid.*)  Section 288a, subdivision
14  (i), criminalizes "an act of oral copulation, where the victim is prevented from
15  resisting by any intoxicating or anesthetic substance, or any controlled
   substance, and this condition was known, or reasonably should have been
16  known by the accused." (*Ibid.*)

17
       The standard of review for a sufficiency of the evidence claim is well
18  established.  We review the entire record in the light most favorable to the
19  judgment to determine whether it contains substantial evidence - that is,
   evidence that is reasonable, credible, and of solid value - from which a
20  reasonable trier of fact could find the defendant guilty beyond a reasonable
21  doubt. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)  We presume in
   support of the judgment the existence of every fact that could reasonably be
22  deduced from the evidence. (*People v. Kraft, supra,* 23 Cal.4th at p. 1053.)
23  We ask whether, after viewing the evidence in the light most favorable to the
24  judgment, any rational trier of fact could have found the allegations to be true
   beyond a reasonable doubt.  (See *Jackson v. Virginia* (1979) 443 U.S. 307,
25  319.)  Unless it is clearly demonstrated that "upon no hypothesis whatever is
   there sufficient substantial evidence to support (the verdict of the jury)," we
26  will not reverse. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

27
       Huynh is mistaken in arguing no evidence linked him to the sexual
28  assault crimes against Williams.  The semen found on Williams's shirt was

33

from Huynh. Moreover, there was additional circumstantial evidence linking Huynh to the sexual crimes. Huynh told his employer that he enjoyed drugging young heterosexual men so he could sexually assault them. Williams had diazepam in his blood; Huynh possessed diazepam and was well-schooled on the effect of diazepam and other benzodiazepine drugs. Forensic evidence connected Huynh to the clothing on the dead body as well as the blanket in which the body was wrapped. The tire tracks near the body matched the tires on a van Huynh had rented. In short, there was ample evidence connecting Huynh to the sexual crimes against Williams.

The criminal offense of sodomy requires the victim to be alive at the time of penetration. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1176.) Huynh argues that oral copulation must also be committed on a live victim. We agree based on the reasoning of the *Ramirez* court and the Legislature's use of the word "person" rather than "body" in both section 286, subdivision (a), which defines sodomy, and section 288a, subdivision (a), which defines oral copulation. [Footnote: The Attorney General acknowledges oral copulation of an intoxicated person "reasonably requires that the victim be alive as he or she must be intoxicated."]

We, however, disagree with Huynh's argument there was insufficient evidence Williams was alive at the time of the sexual assault, and the jury *only* could have found Williams was alive on the basis of "speculation, guesswork and conjecture." Huynh writes: "In light of Williams'(s) severe alcohol intoxication, and based on the absence of the (diazepam) metabolite in his body, it is entirely probable that Williams died right after ingesting diazepam and that any sexual acts took place after his death." However, there was diazepam metabolite in Williams's body. Huynh's comments also ignore expert testimony presented by both parties that the combination of alcohol and diazepam played a role in Williams's death, but was not the cause of death by itself. (See fn. 3 & accompanying text, *ante*.) Moreover, the record does not contain evidence suggesting Huynh intended sexual conduct with a corpse or practiced necrophilia. Rather, the record indicates that Huynh did not have such an intent or practice. The other young men who testified about their encounters with Huynh apparently were drugged by appellant and woke up confused and disoriented. Huynh's modus operandi was to sexually assault young men while they were knocked out by the combination of benzodiazepine drugs and alcohol - not to sexually assault them after they were dead. "(I)n the absence of any evidence suggesting that the victim's assailant intended to have sexual conduct with a corpse (citation), we believe that the jury could reasonably have inferred from the evidence that the assailant engaged in sexual conduct with the victim while she was still alive

1  rather than after she was already dead. Under the applicable standard of
2  review (citations), we conclude that a reasonable trier of fact could have found
   the essential elements of sodomy beyond reasonable doubt." (*People v.*
3  *Ramirez, supra,* 50 Cal.3d at pp. 1176-1177; see *People v. Kraft, supra,* 23
4  Cal.4th at pp. 1059-1060.)

5       As to Huynh's argument on the insufficiency of the evidence of
6  penetration, we begin by noting that such an argument cannot legally apply to
   the oral copulation conviction. Penetration of the mouth or sexual organ is
7  not required for the crime of oral copulation. (*People v. Dement* (2011) 53
8  Cal.4th 1, 41-42.) Sodomy, on the other hand, requires penetration. (*People
   v. Martinez* (1986) 188 Cal.App.3d 19, 23-25.) "Any sexual penetration,
9  however slight, is sufficient to complete the crime of sodomy." (§ 286, subd.
10 (a).) Huynh relies chiefly on the autopsy finding that there was no sign of
11 trauma to the anus or rectum of Williams, but he ignores evidence that one of
   the effects of benzodiazepine is to relax the muscles of the anus and rectum.
12 Dr. Mena, who performed the autopsy, testified that injury to the rectum and
13 anus during a sexual assault could be minimized if the person had ingested
14 benzodiazepine. Huynh also points to evidence he presented that sperm cells,
   which are hardy and easily transferred, are almost always found in male
15 underwear. Huynh argues the eight sperm cells on the anal swab logically
16 could have been from Williams. However, there is no evidence that Williams
   ejaculated around the time of his death. (*People v. Kraft, supra,* 23 Cal.4th at
17 p. 1059.) The record contains sufficient evidence from which a jury
   reasonably could infer the requisite amount of penetration occurred.

18 People v. Huynh, 212 Cal.App.4th at 303-05.

19      As to Petitioner's first contention that insufficient evidence linked him to a sexual
20 assault on Williams, that evidence is reviewed above and is overwhelming. Petitioner has
21 failed to show the denial of this aspect of his claim "reflected an unreasonable application
22 of Jackson and Winship to the facts of this case," Juan H, 408 F.3d at 1274, or was based
23 on an unreasonable determination of the facts. Miller-El, 537 U.S. at 340.

24      As to his contention that insufficient evidence was presented to show Williams was
25 penetrated anally or orally, the state court observed that under state law no penetration is
26 required for oral copulation. Federal habeas courts must analyze Jackson claims "with
27 explicit reference to the substantive elements of the criminal offense as defined by state
28 law." Jackson, 443 U.S. at 324 n.16; see also Bradshaw v. Richey, 546 U.S. 74, 76 (2005)

15cv1924-BTM (AGS)

1  ("We have repeatedly held that a state court's interpretation of state law, including one
2  announced on direct appeal of the challenged conviction, binds a federal court sitting in
3  habeas corpus.")  The aspect of this claim challenging the oral copulation count fails on
4  that basis.  The aspect of the claim challenging the sodomy count fails because under state
5  law only slight penetration is required, and there was sufficient evidence, in the form of
6  sperm found on Williams' anus and testimony that benzodiazepine can relax the muscles
7  of the anus and rectum sufficiently to avoid injuries from penetration, that Petitioner
8  penetrated Williams' anus, if even slightly.  Even if Petitioner could point to other
9  reasonable inferences the jury could have drawn from the evidence, that is not sufficient to
10  satisfy 28 U.S.C. § 2254(d).  See Coleman, 566 U.S. at 656 ("The jury in this case was
11  convinced, and the only question under Jackson is whether that finding was so
12  insupportable as to fall below the threshold of bare rationality.")

13      Petitioner also challenges the sufficiency of the evidence that Williams was alive
14  when he was sexually assaulted.  As the state court observed, a great deal of evidence was
15  presented that Petitioner's "modus operandi was to sexually assault young men while they
16  were knocked out by the combination of benzodiazepine drugs and alcohol - not to sexually
17  assault them after they were dead."  Because overwhelming evidence was presented that
18  Petitioner drugged and sexually assaulted Williams, and had a proclivity for sexually
19  assaulting young men like Williams while they were under the influence of drugs he gave
20  them without their knowledge, but no evidence whatsoever that he sexually assaulted dead
21  bodies, Petitioner has not shown that the state court opinion involves an unreasonable
22  determination of the facts in light of the evidence presented in the state court proceedings,
23  or reflects "an unreasonable application of Jackson and Winship to the facts of this case."
24  Juan H., 408 F.3d at 1274-75; Miller-El, 537 U.S. at 340.

25      The final aspect of claim one alleges there is insufficient evidence to support the
26  convictions for oral copulation of an intoxicated person and sodomy of an intoxicated
27  person with respect to victim Jeremiah.  (ECF No. 1-1 at 4.)  This claim was never
28  presented to any state court, but it is so lacking in merit as to allow the Court to deny it

notwithstanding that failure. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); see also Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005) (holding "that a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim.")

Evidence supporting this conviction includes (a) Petitioner's semen found in Jeremiah's mouth, anus and scrotum, (b) a photograph taken during Jeremiah's SART examination which showed significant injury to his anus, (c) nearly twice the therapeutic level of diazepam was found in Jeremiah's system, (d) Petitioner had a modus operandi of drugging and raping young men like Jeremiah, and (e) Jeremiah testified at the preliminary hearing, which was videotaped and played for the jury at trial, that immediately after Petitioner gave him what he thought was Tylenol he began feeling odd and experiencing memory loss, and when he awoke he was missing his underwear and pocket knife. Although, as discussed in claim two, Petitioner challenges the forensic evidence supporting Jeremiah's testimony, and contends in claim four he was denied his right to confront him at trial, Jeremiah's testimony provided sufficient evidence to support the Jackson standard. See Tibbs v. Florida, 457 U.S. 31, 45 n. 21 (1982) (finding that eyewitness testimony alone is sufficient to satisfy the Jackson standard). Even if the gaps in Jeremiah's memory caused his testimony alone to be insufficient, his testimony, along with the evidence of Petitioner's modus operandi of drugging and sexually assaulting men like Jeremiah, and the SART evidence, is sufficient to support the conviction for sodomy of an intoxicated person.

Habeas relief is denied as to claim one.

### C. Claim Two

Petitioner alleges in claim two that he is actually innocent based on "diligently discovered scientific evidence presented herein [which] undermines the prosecution's entire case and points to petitioner's innocence." (ECF No. 1 at 7; ECF No. 1-1 at 6.) With respect to Williams, that evidence consists of: (1) a 1973 medical journal article which

1 Petitioner argues shows diazepam metabolites are found within fifteen minutes of ingestion
2 rather than hours later as testified to at trial (ECF No. 1-1 at 13, 22-29), and the medical
3 examiner's pre-trial case notes showing the presence of diazepam without a metabolite in
4 Williams' blood (id. at 13-14, 41-42), which, along with failure of the autopsy report to
5 find acidic compounds or acidosis in Williams' blood (ECF No. 30 at 9; ECF No. 41 at 4),
6 Petitioner contends shows Williams died almost instantly after ingesting diazepam before
7 any sexual assault could have occurred (ECF No. 18 at 2); (2) a 1974 report by the
8 International Commission on Radiological Protection (ECF No. 1-1 at 14, 43-45), excerpts
9 from medical journals dated 2014 regarding risk of sudden death in athletes, and comparing
10 diseased hearts to athletes' hearts (id. at 51-58; ECF No. 1-2 at 1-6), excerpts from medical
11 journal articles regarding left ventricular hypertrophy in hypertension, arrhythmia and
12 nephrosclerosis, dated 2013 (ECF No. 1-2 at 7-29), excerpts from a 1984 American Journal
13 of Medicine article on hypertension and sudden death (id. at 30-34), a page of an undated
14 article on cerebral edema which Petitioner contends shows that brain swelling develops
15 over a period of extended slow breathing often during seizures (id. at 35), and a 2000 article
16 from Forensic Science International regarding normal organ weights which Petitioner
17 contends shows brain weight alone is not indicative of brain swelling and asphyxia as
18 testified to at trial (ECF No. 39 at 2; ECF No. 43 at 20-25), all of which Petitioner contends,
19 when coupled with portions of Williams' autopsy and toxicology reports, supports a
20 finding that Williams' enlarged heart is indicative of a higher risk of spontaneous
21 arrhythmia and sudden cardiac death, possibly during a seizure (ECF No. 30 at 2, 9; ECF
22 No. 37 at 5; ECF No. 78 at 4; ECF No. 80 at 31); (3) portions of reports purportedly
23 showing samples were cut from Williams' shirt for DNA analysis after DNA analysis was
24 performed, and dog hair fibers loose in the laboratory, which Petitioner contends raises
25 questions regarding "good lab practices" (ECF No. 1-1 at 18; ECF No. 1-2 at 36-38); (4) a
26 presentation by Dr. Benumof stating that obstructive sleep apnea can cause mild pulmonary
27 edema, which Petitioner contends contradicts Dr. Benumof's trial testimony that sleep
28 apnea could not have been a cause of death (ECF No. 43 at 3-4, 11-14); (5) excerpts from

15cv1924-BTM (AGS)

a 2016 report on forensic science in criminal courts, which Petitioner contends shows that mixed DNA from two people may lead to unreliable testing results, and that tire impression evidence is problematic (ECF No. 78 at 3, 10-23); and (6) correspondence from the National Institute of Science and Technology confirming that carbon dioxide and lactic acid can be measured by the methods used in Williams' autopsy, in support of Petitioner's argument that the autopsy should have tested for those substances, as well as for "flight or fight" proteins released during stress, in order to support or refute the prosecution's theory of the cause of death (ECF No. 74 at 1, 3; ECF No. 78 at 5-6; ECF No. 80 at 22).

The evidence presented to support the actual innocence claim as to Jeremiah consists of: (1) excerpts from Jeremiah's emergency room notes showing the benzodiazepine found in his system when first tested the day after he met Petitioner was Alprazolam or Xanax rather than Klonopin, which Petitioner contends should have been entered at trial to show the discrepancy between it and the SART toxicology report used at trial showing Klonopin in Jeremiah's blood two days later to show he used Klonopin after he met Petitioner (ECF No. 1-1 at 19-20; ECF No. 1-2 at 42-43, 45; ECF No. 66 at 6); (2) excerpts from the preliminary hearing testimony of Detective Velovich stating he was told by the SART nurse that Jeremiah was alert and oriented during his examination and there were no drugs or alcohol found in his blood (ECF No. 66 at 1, 4), emergency room notes reporting Jeremiah "does not think he was sexually assaulted" (ECF No. 1-2 at 44), and a patient history page indicating Jeremiah had not defecated for two days, which Petitioner contends might cause a hard stool resulting in the anal tear attributed to sodomy (ECF No. 1-1 at 20; ECF No. 1-2 at 46), all of which Petitioner argues refute the jury finding he was sexually assaulted; (3) reports from the DNA testing laboratories in this case showing ten unidentified alleles not attributable to Petitioner or Jeremiah, which could be used to argue "a possible third DNA contributor" to the sperm found in Jeremiah's SART exam and refute his claim of heterosexuality (ECF No. 1-1 at 19; ECF No. 1-2 at 39-41; ECF No. 18 at 6); (4) a drug reference report indicating clonazepam is a benzodiazepine derivative similar to diazepam (ECF No. 1-2 at 47), a 2010 article from the Journal of Microbiological

Methods regarding a method for determining metabolites (ECF No. 80 at 24-29), a medical journal article regarding the pharmacokinetics of clonazepam, and two pages from an undated article on that subject (ECF No. 1-2 at 48-54), all of which Petitioner contends shows Jeremiah's metabolite concentration was high enough to show he was suffering from benzodiazepine withdrawal and was therefore a chronic user (ECF No. 1-1 at 21); and (5) excerpts from a 2004 article from the American Society for Pharmacology and Experimental Therapeutics which Petitioner contends shows Jeremiah could not have been unconscious as a result of the level of diazepam in his blood (ECF No. 41 at 5-10), the entirety of which he argues shows Jeremiah fabricated his allegations in order to avoid being discharged from the military for drug use and consensual homosexual conduct.

To the extent the actual innocence claim is not merely a restatement of claim one, it has never been presented to any state court. In this Court's May 23, 2016 order, the Court determined this claim is technically exhausted because state court remedies no longer remain available, and that it is therefore procedurally defaulted. (ECF No. 35 at 5.) In that order, the Court noted:

> It is an open question whether a freestanding claim of actual innocence, as opposed to its use as a gateway to avoid a procedural default, is cognizable on federal habeas. See Jones v. Taylor, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceedings in the non-capital context, although we have assumed that such a claim is viable."), citing McQuiggin v. Perkins, 569 U.S. ___, 133 S.Ct. 1924, 1931 (2013) (noting that it is, as yet, unresolved whether a freestanding actual innocence claim is cognizable on federal habeas) and Herrera v. Collins, 506 U.S. 390, 417 (1993) (acknowledging the possibility that a freestanding actual innocence claim would exist in the capital context).

(Id. at 4.)

Assuming a freestanding claim of actual innocence is cognizable on federal habeas, it is clear that Petitioner's claim of actual innocence fails on the merits. The standard of review for claims which are technically exhausted and procedurally defaulted is unclear. Slovik v. Yates, 556 F.3d 747, 751 n.4 (9th Cir. 2009). However, denial of the claim under

a de novo review assures a finding that Petitioner is not entitled to federal habeas relief irrespective of any procedural default or failure to exhaust. See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) (holding that when the standard of review is unclear, a federal habeas court may conduct a de novo review to deny a petition "because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review.")

In order to satisfy Schlup, Petitioner "must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting Schlup, 513 U.S. at 327. This Court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). "A petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that '"a court cannot have confidence in the outcome of the trial.'" Majoy, 296 F.3d at 776, quoting Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1997) (en banc), quoting Schlup, 513 U.S. at 316.

Here, Petitioner argues that his "newly discovered" evidence shows Williams might not have died while Petitioner was in the act of orally copulating or sodomizing him while he was intoxicated, as the jury found, because it shows that sudden cardiac arrhythmia, possibly brought on by a seizure, may have been the cause of death, and it contradicts the trial testimony of several doctors that positional asphyxia was the likely cause of death, in particular Dr. Benumof's testimony that it was the only possible cause of death. He also contends it refutes the jury's finding that he drugged and sexually assaulted Jeremiah because it shows Jeremiah initially denied being sexually assaulted, and was a chronic benzodiazepine user who may have lied in order to avoid being discharged from the Navy for drug use and consensual homosexual behavior. However, the "new evidence" consists of evidence produced for and at trial, and scientific articles, most of which were available

1  to the medical community at the time of trial. Furthermore, Petitioner's arguments were
2  presented at trial. As set forth above, the defense presented evidence that the Chief Medical
3  Examiner for the State of Utah, the Chief Medical Examiner for San Diego County, and
4  five San Diego County Medical Examiners, all considered Williams' cause of death as
5  undetermined even after they were presented with the prosecution's evidence. The defense
6  doctors opined that Williams could have died of cardiac arrest, and that the combined
7  effects of alcohol and diazepam in his system could have suppressed his respiration to the
8  point of causing death, or he could have died by slumping over in a position which blocked
9  his airway due to being intoxicated. The defense also presented medical testimony that
10  Williams' 60 percent arterial blockage could have caused or contributed to his death.

11       Dr. Mena testified that he found diazepam in Williams' blood during the autopsy,
12  that because there were higher levels of diazepam in the blood and only trace amounts in
13  gastric contents, it had been absorbed prior to death, and the absence of metabolites meant
14  that at the time Williams died he had not had time to break down the diazepam into
15  metabolites. (RT 812-17.) Dr. Grey testified that metabolites of diazepam occur within "a
16  number of hours" of ingestion, and Williams could have died within hours of taking
17  diazepam. (RT 3781.) Even if Petitioner is correct that there is scientific literature showing
18  that the lack of metabolites of diazepam in Williams' blood meant he died within fifteen
19  minutes of ingesting the drug, he has not shown that fifteen minutes was not enough time
20  for him to sexually assault Williams before he died. In sum, Petitioner's actual innocence
21  claim is an attempt to reargue issues which were fully and fairly presented to the jury and
22  decided against him, and his "newly discovered evidence" does not refute the testimony of
23  the medical experts at trial regarding the cause of death, or establish Williams died so soon
24  after taking diazepam that Petitioner did not have time to sexually assault him.

25       In reviewing the "total record" the Court must make "a probabilistic determination
26  about what reasonable, properly instructed jurors would do." Schlup, 513 U.S. at 329.
27  "The court's function is not to make an independent factual determination about what likely
28  occurred, but rather to assess the likely impact of the evidence on reasonable jurors." Bell,

15cv1924-BTM (AGS)

1 | 547 U.S. at 538 ("[I]t bears repeating that the Schlup standard is demanding and permits
2 | review only in the extraordinary case.") Petitioner has failed to support his contention that
3 | Williams likely died in a manner not fully and fairly presented to the jury, and has not
4 | carried his burden of demonstrating that it is "more likely than not, in light of the new
5 | evidence, no reasonable juror would find him guilty beyond a reasonable doubt." Id.;
6 | Majoy, 296 F.3d at 778. Nor has he shown that this Court "cannot have confidence in the
7 | outcome of the trial." Schlup, 513 U.S. at 316. As discussed below in claim three, the
8 | same is true regarding Jeremiah, as Petitioner challenges the DNA and blood testing
9 | evidence presented at trial but fails to show it refutes the evidence supporting the finding
10 | that he orally copulated and sodomized Jeremiah while he was intoxicated.

11 | Based on a de novo review, the Court denies habeas relief on the actual innocence
12 | claim to the extent it presents a freestanding constitutional claim.

13 | **D. Claim Three**

14 | Petitioner alleges in claim three that he received ineffective assistance of trial
15 | counsel in violation of the Sixth Amendment due to: (a) a conflict arising from a hostile
16 | and uncommunicative relationship with counsel, and (b) counsel's failure to (i) request a
17 | change of venue, (ii) point out discrepancies in witness testimony to the jury, (iii) request
18 | a jury instruction on the felony murder escape rule, (iv) present evidence of third party guilt
19 | and contamination of laboratory samples, (v) object to inflammatory statements, and (vi)
20 | investigate Petitioner's diagnosis of schizophrenia for use at trial as a defense and at
21 | sentencing as mitigation. (ECF No. 1 at 8; ECF No. 1-1 at 3-5, 7-8, 11-12.)

22 | The ineffective assistance of counsel claim presented in Petitioner's California
23 | Supreme Court habeas petition included only two of the allegations of ineffective
24 | assistance of counsel raised here, namely, that counsel failed to introduce a Navy
25 | toxicology report showing Jeremiah did not have clonazepam in his blood the day after he
26 | met Petitioner, and failed to challenge discrepancies between police reports and the
27 | testimony of several trial witnesses, and between a laboratory technician's preliminary
28 | hearing testimony and a statement he made to defense counsel. (ECF No. 83-4 at 4.) That

43

1    petition was denied with an order which stated: "The petition for writ of habeas corpus is

2    denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474; *In re Lessard* (1965) 62 Cal.2d

3    497, 503; *In re Waltreus* (1965) 62 Cal.2d 218, 225; *In re Dixon* (1953) 41 Cal.2d 756,

4    759; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Lindley* (1947) 29 Cal.2d 709, 723.)"

5    (ECF No. 12-10 at 1.)

6         Respondent "assumes" the state supreme court applied the <u>Duvall</u> citation to the

7    ineffective assistance of counsel claim presented in the state habeas petition, and contends

8    that the <u>Duvall</u> citation means the state court denied the claim as meritless because it is

9    vague and conclusory. (ECF No. 16-1 at 11.) Respondent argues that the denial on that

10    basis is neither contrary to, nor involves an unreasonable application of, clearly established

11    federal law which provides that Petitioner must show counsel did not provide reasonably

12    competent representation as well as prejudice arising from counsel's errors, because

13    Petitioner does not identify the alleged discrepancies or provide a declaration from counsel

14    explaining why counsel did not seek to admit that evidence. (<u>Id.</u> at 11-13.)

15         Where a state court order invokes more than one state procedural bar to deny

16    multiple claims but fails to specify which rule applies to which claim, as here, federal

17    habeas review is not barred unless all of the cited state procedural bars are adequate to

18    support the judgment and independent of federal law. <u>Washington v. Cambra</u>, 208 F.3d

19    832, 834 (9th Cir. 2000). The <u>Waltreus</u>, <u>Duvall</u> and <u>Swain</u> citations do not appear to be

20    adequate and independent so as to support a procedural default. <u>See Hill v. Roe</u>, 321 F.3d

21    787, 789 (9th Cir. 2003) (holding that <u>Waltreus</u> does not preclude federal habeas review),

22    citing <u>Nunnemaker</u>, 501 U.S. at 805 (noting that <u>Waltreus</u> provides that claims presented

23    on direct review may not ordinarily be relitigated on habeas, and <u>Swain</u> provides that facts

24    relied on in a habeas petition must be alleged with particularity); <u>Seeboth v. Allenby</u>, 789

25    F.3d 1099, 1104 n.3 (9th Cir 2015) ("a citation to <u>Duvall</u> and <u>Swain</u> together constitutes

26    dismissal without prejudice with leave to amend to plead required facts with particularity.")

27    Thus, it is unclear whether and to what extent the state court applied procedural bars to

28    those aspects of claim three which were presented in the state habeas petition.

In addition, the majority of the ineffective assistance of counsel allegations contained in the federal Petition are different than those presented in the state habeas petition and have never been presented to any state court. For the same reasons regarding the actual innocence claim (see ECF No. 35 at 5), the aspects of the ineffective assistance of counsel claim which were not presented to the state court are technically exhausted and procedurally defaulted.

Because Petitioner argues that any default should be excused because his appellate attorney was ineffective in failing to raise this ineffective assistance of trial counsel claim (ECF No. 1-1 at 9), the Court would have to examine the merits of claim three to determine if he can overcome any procedural default. See Murray v. Carrier, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State.") And because Petitioner proceeded *pro se* during his state habeas proceeding, he can overcome a procedural default as to the ineffective assistance of trial counsel claim if he can establish it is a "substantial" claim. See Martinez v. Ryan, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.") The Court must examine the merits of the ineffective assistance of counsel claim in order to determine if it presents a "substantial" claim sufficient to excuse the default. See id. at 14 (holding that a claim is "substantial" if the petitioner can show that "the claim has some merit.") The AEDPA limitation on expanding the record does not apply in making that determination. See Dickens v. Ryan, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc) (holding that a petitioner is "entitled to present evidence to demonstrate that there is 'prejudice,' that is that petitioner's claim is 'substantial' under Martinez. Therefore, a district court may take evidence to extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under Martinez.")

1    The Ninth Circuit has indicated that: "Procedural bar issues are not infrequently
2  more complex than the merits issues presented by the appeal, so it may well make sense in
3  some instances to proceed to the merits if the result will be the same." Franklin v. Johnson,
4  290 F.3d 1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525
5  (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be
6  resolved first; only that it ordinarily should be.")  Because the ineffective assistance of
7  counsel claim clearly fails on the merits, the Court finds that the interests of judicial
8  economy is better served by denying it without determining to what extent it is procedurally
9  defaulted, or whether Petitioner can excuse any default. Franklin, 290 F.3d at 1232.

10    In order to establish constitutionally ineffective assistance of counsel, Petitioner
11  must show counsel's performance was deficient, which "requires showing that counsel
12  made errors so serious that counsel was not functioning as the 'counsel' guaranteed the
13  defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984).
14  He must also show counsel's deficient performance prejudiced his defense, which requires
15  showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a
16  trial whose result is reliable." Id.  To show prejudice, Petitioner need only demonstrate a
17  reasonable probability that the result of the proceeding would have been different absent
18  the error. Id. at 694. A reasonable probability is "a probability sufficient to undermine
19  confidence in the outcome." Id. Petitioner must establish both deficient performance and
20  prejudice to establish ineffective assistance of counsel. Id. at 687.

21    "Representation is constitutionally ineffective only if it 'so undermined the proper
22  functioning of the adversarial process' that the defendant was denied a fair trial." Richter,
23  562 U.S. at 110, quoting Strickland, 466 U.S. at 686. "Surmounting Strickland's high bar
24  is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). The Strickland
25  standard is "difficult to meet," Richter, 562 U.S. at 105, and "highly deferential."
26  Pinholster, 563 U.S. at 181.
27  / / /
28  / / /

Petitioner first alleges that he had a hostile and uncommunicative relationship with his trial counsel which amounted to a conflict of interest:

> In the beginning of petitioner's representation, one of the defense counsels chided and accused petitioner of "dumping Mr. Williams in an alley like a piece of trash." Relations were hostile from the very beginning. At one point there was no communication at the trial table. Petitioner tried to pass a note to the judge for help but the Bailiff told petitioner to give the note to his defense counsels who then confiscated it. Petitioner then spoke up and asked the Court if he could speak to the Court but the Court told him no and told him to speak to his attorneys.

(ECF No. 1-1 at 8.)

The Sixth Amendment does not guarantee a defendant a "meaningful relationship" with counsel. Morris v. Slappy, 461 U.S. 1, 13-14 (1983). However, if Petitioner was forced to go to trial with an attorney with whom there was a breakdown in communication so complete it prevented effective assistance of counsel, he can establish a Sixth Amendment violation. Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007); see also Wood v. Georgia, 450 U.S. 261, 271 (1981) (holding that a criminal defendant is entitled under the Sixth Amendment to representation free from conflicts of interest). In order to demonstrate a conflict of interest which rises to the level of a federal constitutional violation, Petitioner must show that his trial counsel actively represented conflicting interests and the conflict adversely affected counsel's performance. Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). Petitioner's allegations of a hostile relationship and a single instance of lack of communication are clearly insufficient to satisfy those standards.

Petitioner alleges counsel failed to request a change of venue based on "repeated, salacious media coverage," and argues that under state law he need not show prejudice because he was sentenced to life without parole. (ECF No. 1-1 at 12, citing Williams v. Superior Court, 34 Cal.3d 584 (1983) (holding that in determining whether a defendant cannot receive a fair trial in a particular county, the court must examine "(1) the nature and extent of the publicity; (2) the size of the [county's] population; (3) the nature and gravity of the offense; (4) the status of the victim and of the accused; and (5) whether political

15cv1924-BTM (AGS)

1  overtones are present.")) Petitioner has presented no evidence to support any of those
2  factors, but presents a conclusory allegation that the media coverage was "repeated" and
3  "salacious." There is no basis to find that his attorney had grounds for making a motion
4  for a change of venue, or that it would have been granted had he done so, and conclusory
5  allegations such as these are insufficient to prove counsel provided ineffective assistance.
6  Blackledge v. Allison, 431 U.S. 63, 74 (1977) (denying habeas relief on the basis that
7  "presentation of conclusory allegations unsupported by specifics is subject to summary
8  dismissal, as are contentions that in the face of the record are wholly incredible."); see also
9  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (denying habeas relief as to ineffective
10 assistance of counsel claim on the basis that "[c]onclusory allegations which are not
11 supported by a statement of specific facts do not warrant habeas relief".)
12      Petitioner next alleges counsel was deficient in failing to point out to the jury
13 "discrepancies between police reports, prelim, and trial testimony of [David G., Ryan R.]
14 and Allison White or Kohler." (ECF No. 1-1 at 4.) Although no allegations supporting
15 this claim are contained in the Petition, Petitioner alleges in his Traverse that counsel
16 should have pointed out to the jury that Allison Kohler-White said in her police statement
17 that when she saw Williams on the night he disappeared she asked her friend Sara Morache
18 whether she thought something was wrong with Williams, but that Morache's police
19 statement did not recount that question to her by Kohler-White. (ECF No. 18 at 8.) He
20 also contends Kohler-White said Williams got up and walked away as soon as she went
21 over to help him, but Shannon Munoz told the police that Kohler-White told her Williams
22 did not walk away for thirty minutes, and Petitioner contends that Kohler-White said
23 Williams was unable to speak at that time but two other witnesses testified he was able to
24 speak when they encountered him about the same time. (Id. at 8-9.) In light of the
25 overwhelming evidence connecting Petitioner to Williams' death, defense counsel's failure
26 to point out those minor discrepancies does not "undermine confidence in the outcome" of
27 the trial. Strickland, 466 U.S. at 694.
28 ///

15cv1924-BTM (AGS)

Petitioner contends Ryan R. said he went to Mexico only once with Petitioner, but cell phone records could have shown they went to Mexico together twice, and counsel failed to subpoena the cell phone records. (ECF No. 18 at 6-7.) He contends counsel failed to argue that sperm found on David G.'s shirt, which did not belong to David G. or Petitioner, was evidence that David was not a heterosexual as he claimed, and that counsel failed to point out inconsistencies: (a) in David's description of the color and make of Petitioner's car, (b) in a statement where David said he was drinking at a club on Hancock Street and took a cab downtown, and another statement where he said he was drinking downtown and then walked around, and (c) when David said in one statement he left his watch in Petitioner's car, and in another that he only noticed it missing when he woke up. (Id. at 7-8.) Petitioner's contention that pointing out minor discrepancies in the testimony of two of the four men who came forward to testify at trial that Petitioner drugged and sexually assaulted them, would have weakened the evidence that he had a modus operandi of drugging and sexually assaulting such men, is without merit in light of the overwhelming evidence of that modus operandi, which includes his own admission to one of his employers that he had sex with young men whom he drugged. Petitioner has not shown either that "counsel's errors were so serious as to deprive him of a fair trial," or "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 687, 694.

Petitioner alleges counsel was deficient in failing to request jury instructions on the felony murder escape rule. (ECF No. 1-1 at 4, citing People v. Wilkins, 56 Cal.4th 333 (2013) (holding that when a killing is committed during flight from a felony, the escape rule provides that felony murder liability continues throughout the flight until the killer reaches a place of temporary safety).) Petitioner has shown no basis for this instruction, merely arguing "that the jury could have concluded that petitioner had reached a place of safety before the death, as no time of death was established." (ECF No. 30 at 5.) He has not alleged facts which, if true, show his counsel was deficient in failing to request the instruction or that he was prejudiced by the failure to so instruct the jury.

1    Petitioner alleges counsel was deficient in failing to present evidence that implicated
2    another person, stating that: "According to police reports in discovery, Antonio Torres was
3    a suspect who used breathing techniques to evade police lie detector test." (ECF No. 1-1
4    at 8.) He contends the DNA reports show ten unidentified alleles not attributable to him,
5    which he argues could be used to argue "a possible third DNA contributor." (Id. at 19;
6    ECF No. 1-2 at 39-46.) The fact that the police interviewed a suspect and gave him a lie
7    detector test in a case that went unsolved for 18 months, or that there were unidentified
8    alleles in DNA testing where undisputed forensic evidence tied Petitioner to Williams'
9    body, does not establish sufficient support for presenting a third party defense at trial. See
10    Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983) (evidence of third party culpability
11    is inadmissible in a California criminal trial "if it simply affords a possible ground of
12    suspicion against such person; rather, it must be coupled with substantial evidence tending
13    to directly connect that person with the actual commission of the offense.")

14    Petitioner next alleges counsel was deficient in failing to present evidence of
15    contamination of laboratory samples, contending that reports regarding the handling of
16    DNA evidence in this case raises questions regarding "good lab practices." (ECF No. 1-1
17    at 18; ECF No. 1-2 at 36-38.) Petitioner sent a letter to the trial judge objecting to a
18    proposed stipulation regarding police laboratory work, contending that San Diego Police
19    Department Criminalist Sean Soriano stated in a March 2009 report that he cut samples for
20    DNA testing from Williams' shirt, but another report stated that the DNA testing on those
21    samples was done in January 2009. (CT 500-01.) The evidence Petitioner relies on to
22    show a discrepancy is one page of the three-page report from Soriano dated March 10,
23    2009, stating that he had impounded the cuttings, but providing no indication when the
24    samples were prepared (ECF No. 1-2 at 36), and one page of a four-page report dated
25    January 20, 2009, stating that Williams' DNA was found on a cutting from his shirt, but
26    without stating what date the cutting was tested (id. at 37). Petitioner states that Soriano
27    clarified the issue at the preliminary hearing when he testified that he made the cuttings
28    before they were tested, and that he prepared his report several months later. (ECF No. 18

at 18.) Petitioner was represented by two attorneys at trial, and stated in his letter to the judge that both attorneys interviewed Soriano prior to the preliminary hearing. (CT 503-03.) Petitioner alleges Soriano admitted to counsel during that interview that he made the cuttings in March after the January testing, and counsel told Petitioner they would testify at trial in order to contradict Soriano, but did not do so. (Id.)

This claim is without merit because the only evidence Petitioner provides of a discrepancy between when the cuttings were prepared and when they were tested for DNA are the portions of the reports which do not contain the dates of the cuttings or testing. Soriano was the first witness called by the defense and was asked about the procedures he used in making cuttings from Williams' shirt for DNA analysis, but not about the dates he made the cuttings. (RT 3559-60.) Even if there is some discrepancy in the reports, the record shows it was investigated by defense counsel, and Petitioner has not shown his counsel were unaware of the issue or failed in their representation of him by not testifying at trial regarding what Soriano said to them prior to the preliminary hearing or otherwise revisiting the issue at trial. See Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect"), citing Strickland, 466 U.S. at 690 (holding that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); Burt v. Titlow, 571 U.S. 12, 22-23 (2013) (recognizing "that the burden to 'show that counsel's performance was deficient' rests squarely on the defendant, . . . It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct (fell) within the wide range of reasonable professional assistance.'"), quoting Strickland, 466 U.S. at 687, 689.

Petitioner next contends, as he does in his actual innocence claim, that counsel should have pointed out a discrepancy in drug testing to argue Jeremiah had a motive to fabricate his allegations. Jeremiah testified that he met Petitioner on the evening of June 6, 2009, and asked Petitioner to stop somewhere to get something for a headache. Petitioner gave him a pill from a Tylenol bottle, after which he blacked out. (ECF No. 17-

1    5 at 20-28.) When he returned to base the next day he went to the base emergency room,
2    and although he did not think he had been sexually assaulted, other people who heard his
3    story did, and he was referred for a SART examination which took place at 5:00 p.m. on
4    June 8, 2009. (Id. at 43-46; RT 1120.) Jeremiah was tested for drugs on base on June 7,
5    2009, at 9:48 p.m., and according to a report submitted by Petitioner was found to have the
6    benzodiazepine Alprazolam, also known as Xanax, in his system. (ECF No. 1-2 at 43.) A
7    toxicologist from Biotox Laboratories testified at trial that Jeremiah's blood and urine was
8    taken about 6:00 p.m. on June 8, 2009, during the SART examination, that it tested positive
9    for the benzodiazepine Klonopin, also called clonazepam, and, assuming he took the drug
10   about 42 hours earlier, late on the night of June 6, there would have been a higher than a
11   therapeutic dose in his system at that time, potentially double that amount. (RT 1712-22.)

12       Petitioner contends the base emergency room notes state that Jeremiah denied being
13   sexually assaulted, and that the drug test at that time shows that the benzodiazepine found
14   in his system on June 7 was Xanax rather than Klonopin, and that report should have been
15   entered at trial to show the discrepancy between it and the Biotox report used at trial which
16   found Klonopin in his system. (ECF No. 1-1 at 3-4, 19-20; ECF No. 1-2 at 42-43, 45; ECF
17   No. 18 at 9-10; ECF No. 62 at 9; ECF No. 66 at 6.) He contends counsel should have
18   presented this evidence to the jury to show Jeremiah denied he had been sexually assaulted
19   when examined on base, and that he used Xanax several days before he met Petitioner and
20   Klonopin after they met, in order to show he was a regular benzodiazepine user who had a
21   motive to fabricate allegations against Petitioner to explain his drug use and consensual
22   homosexual activity, both of which at the time could have resulted in his being discharged
23   from the Navy. (ECF No. 1-1 at 5-6; ECF No. 41 at 2-4.) However, Jeremiah testified he
24   initially did not think he had been sexually assaulted, and Petitioner has not shown that the
25   Klonopin found in Jeremiah's blood during the SART examination could not have come
26   from Petitioner. Even if there is some discrepancy, in light of the overwhelming evidence
27   of Petitioner's modus operandi of drugging young heterosexual men with benzodiazepine
28   in order to rape them, counsel's failure to point out to the jury that the base emergency

15cv1924-BTM (AGS)

1  room test revealed Xanax rather than Klonopin as the benzodiazepine found in Jeremiah's
2  blood, in order to argue a motive to fabricate his allegations, did not constitute ineffective
3  assistance. See Strickland, 466 U.S. at 687, 694 (petitioner must show that "counsel's
4  errors were so serious as to deprive him of . . . a trial whose result is reliable . . . [and] a
5  probability sufficient to undermine confidence in the outcome.")
6      Petitioner alleges counsel failed "to object to inflammatory remarks." (ECF No. 1-
7  1 at 12.) The only such remark identified is a comment by the trial judge about Petitioner
8  that "he's a character but he got no character." (Id.) Petitioner provides no record citation,
9  does not indicate the context of the remark, such as whether it was made in front of the
10 jury, and, as discussed below in claim five, has not shown the judge was biased. This claim
11 fails as conclusory. Blackledge, 431 U.S. at 74; James, 24 F.3d at 26.
12     In the final aspect of claim three presented in the Petition, Petitioner alleges counsel
13 failed to investigate his mental condition in order to consider whether a mental health
14 defense should have been presented at trial or for mitigation at sentencing, stating: "The
15 doctor who was commission by [the Social Security Administration] who diagnosed
16 petitioner with schizophrenia was a practicing psychiatrist and could have been called to
17 testify." (ECF No. 1-1 at 8, at 11.) However, he does not allege he made counsel or the
18 court aware he had been diagnosed with schizophrenia, and has not identified what effect
19 his schizophrenia would have had at his trial or sentencing. "It is not enough 'to show that
20 the errors had some conceivable effect on the outcome of the proceeding.'" Richter, 562
21 U.S. at 104, quoting Strickland, 466 U.S. at 693; see also People v. Dillon, 34 Cal.3d 441,
22 477 (1983) (holding that first degree felony murder includes "a variety of unintended
23 homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it
24 embraces both calculated conduct and acts committed in panic or rage, or under the
25 dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are
26 highly probable, conceivably possible, or wholly unforeseeable.")
27     Several aspects of claim three are presented for the first time in Petitioner's Traverse,
28 and have never been presented to any state court. Petitioner argues that defense counsel

1   should have challenged the tire track evidence on the basis that such evidence has been
2   shown to be unreliable, that the tire track expert also found the van Petitioner rented could
3   not have make skid marks found near the body, and because the tire track expert was in
4   fact a shoe print expert. (ECF No. 18 at 10-11.) He also claims that counsel should have
5   pointed out inconsistencies in statements from Petitioner's employers who said he told
6   them he liked to drug and rape young men, and should have raised issues of their bias
7   against him (id. at 25-28), and that the cumulative effect of trial counsels' errors is
8   prejudicial. (Id. at 16-17.)

9       As with the other minor inconsistencies in the witness testimony addressed above,
10  Petitioner has not overcome the strong presumption that counsel's failure to bring these
11  inconsistencies to the jury's attention is deficient rather than a trial tactic, and, in light of
12  the overwhelming evidence of his modus operandi and connecting him to Williams' dead
13  body, does not "undermine confidence in the outcome" of the trial. Strickland, 466 U.S.
14  at 694. As to his claim that the cumulative effect of counsel's errors was prejudicial, "[i]t
15  will generally be appropriate for a reviewing court to assess counsel's overall performance
16  throughout the case in order to determine whether the 'identified acts or omissions'
17  overcome the presumption that a counsel rendered reasonable professional assistance."
18  Kimmelman v. Morrison, 477 U.S. 365, 386 (1986), quoting Strickland, 466 U.S. at 689.
19  A review of the actions by defense counsel in this case does not rebut that presumption.

20      Accordingly, based on a de novo review, the Court finds that the allegations in claim
21  three, even if true, do not demonstrate a violation of Petitioner's Sixth Amendment right
22  to the effective assistance of counsel. Habeas relief is denied as to claim three.

23  **E.    Claim Four**

24      Petitioner alleges in claim four that his rights to due process and a fair trial under the
25  Fifth and Fourteenth Amendments was violated by: (a) the use of his sex offenses to show
26  he possessed a propensity to commit the charged offenses, (b) inability to confront
27  Jeremiah at trial when a videotape of his preliminary hearing testimony was played in lieu
28  of his appearance, and inability to confront Jeremiah's SART nurse when a non-treating

nurse testified as to the SART findings, (c) jury instruction errors regarding causation, failure to instruct that intent to kill is an element of murder under the felony murder rule, and failure to instruct on lesser included offenses of battery, second degree murder and manslaughter, (d) a biased judge, and (e) the cumulative effect of the errors. (ECF No. 1 at 9; ECF No. 1-1 at 4, 6-12.) Respondent answers: "Respondent is unable to determine the underlying basis of this claim, and a review of the habeas petition filed in the state supreme court does not indicate what the basis of the claim might be. Consequently, the claim should be rejected as vague and conclusory." (ECF No. 16-1 at 14.)

The first aspect of claim four alleges Petitioner was denied his federal constitutional rights to due process and a fair trial because the jury was allowed to consider evidence of his bad character as propensity to commit sex offenses, in the form of "salacious details, without corroborating physical evidence, of partying and people waking up in hotels." (ECF No. 1-1 at 6-7.) Petitioner alleged on direct appeal in both the appellate and supreme courts that: "The admission of charged sex acts to show a propensity to commit other charged sex acts and to allow a jury to convict upon such evidence denies a criminal defendant of his right to due process of law and a fair trial" under the Fifth and Fourteenth Amendments. (ECF No. 12-2 at 83-85; ECF No. 12-9 at 36-38.)

The last reasoned state court opinion addressing this claim denied it on the basis that the California Supreme Court permits the use of charged offenses as propensity evidence. (ECF No. 12-4, People v. Huynh, No. D060327, slip op. at 36-37, citing People v. Villatoro, 54 Cal.4th 1152, 1167-68 (2012) ("Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence.")) The Ninth Circuit has found that because the United States Supreme Court has specifically reserved ruling on the issue regarding whether introduction of propensity evidence in a state trial could violate federal due process, and has denied certiorari at least four times on the issue since, there is no "clearly established federal law" on the issue, precluding habeas relief where 28 U.S.C. § 2254(d)(1) applies. Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006). There is no basis to apply 28 U.S.C. § 2254(d)(2) to this

claim, which therefore does not provide a basis for federal habeas relief.

Petitioner next contends he was denied his Sixth Amendment right to confrontation when a non-treating nurse was allowed to testify as to the findings of Jeremiah's SART nurse. (ECF No. 1-1 at 4.) This claim was presented to the state appellate and supreme courts on direct appeal. (ECF No. 12-2 at 104-19; ECF No. 12-9 at 30-36.) The last reasoned state court decision addressing this claim is the state appellate court opinion:

> Huynh contends the trial court violated his Sixth Amendment right to confront witnesses by allowing a nurse to testify about Jeremiah's sexual assault examination conducted by another nurse. The contention is without merit.
>
> ### Background
>
> At the time of trial, Danella Kawachi, the registered nurse who conducted a SART examination on Jeremiah on June 8, 2009, was unavailable because she was awaiting a heart transplant. The trial court, over the objection of Huynh, allowed the prosecution to present the testimony of Claire Nelli, a registered nurse who was Kawachi's supervisor and employer.
>
> Nelli testified she and Kawachi are forensic nurses certified to perform sexual assault examinations of victims and suspects. Nelli is the owner of one of the SART facilities in San Diego and personally reviews all reports and photographs taken during examinations in her facility. Nelli explained to the jury how SART examinations are performed according to a state protocol, which, among other things, calls for photographs to be taken to document the nurse's findings. During Nelli's testimony, she reviewed two photographs from the SART examination of Jeremiah's anus and rectum and stated her independent opinion - based on her experiences examining more than 1,000 anuses during the course of 2,000 SART examinations - that the photographs showed significant trauma to the anus. Nelli did not describe to the jury Kawachi's findings and opinions regarding the examination and Jeremiah's injuries.
>
> ### Legal Principles
>
> In *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*), the United States Supreme Court held that the Sixth Amendment's confrontation clause prohibits admission of out-of-court "(t)estimonal statements of witnesses absent from trial (unless) the declarant is unavailable," and "only

where the defendant has had a prior opportunity to cross-examine." The *Crawford* court did not set forth "a comprehensive definition" of what constitutes "testimonial evidence," but held that "(w)hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.) Elaborating to some degree, the *Crawford* court also stated the "core class" of testimonial statements included "'ex parte in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' . . . 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' . . . 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id.* at pp. 51-52, citations & italics omitted.)

Subsequently, the high court addressed what constituted testimonial statements in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, (*Melendez-Diaz*); *Bullcoming v. New Mexico* (2011) 564 U.S. ___, 131 S.Ct. 2705 (*Bullcoming*); and *Williams v. Illinois* (2012) 567 U.S. ___, 132 S.Ct. 2221 (*Williams*).

In *Melendez–Diaz, supra,* 557 U.S. at pages 308 through 309, a drug case, the prosecution introduced "'certificates of analysis'" prepared by laboratory analysts who did not testify; the certificates reported that a substance found in the defendant's car was cocaine. The Supreme Court held the certificates were "within the 'core class of testimonial statements,'" and, therefore, their use violated the defendant's Sixth Amendment rights under *Crawford.* (*Melendez–Diaz, supra,* at p. 310.) Each certificate was a ""'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" . . . functionally identical to live, in-court testimony . . . (¶) . . . '"made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,"'. . . (and created) to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." (*Id.* at pp. 310-311.)

In *Bullcoming, supra,* 131 S.Ct. 2705, a drunk driving case, the high court again held that a laboratory analyst's certificate was a testimonial statement that could not be introduced unless the analyst was unavailable for trial and the defendant had a prior opportunity to confront that witness. (*Id.* at pp. 2710, 2713.) The defendant's blood sample was sent to a state

laboratory for testing after he was arrested for drunk driving. (*Id.* at p. 2710.) The analyst who tested the defendant's blood sample recorded the results on a state form that included a "'certificate of analyst.'" (*Ibid.*) At trial, the analyst who tested his blood sample did not testify, but a colleague familiar with the laboratory's testing protocol testified. (*Id.* at pp. 2711-2712.)

The *Bullcoming* court explained that another analyst who did not participate in or observe the test on the defendant's sample was an inadequate substitute or surrogate for the analyst who performed the test. (*Bullcoming, supra,* 131 S.Ct. at p. 2715.) Testimony by someone who qualified as an expert regarding the machine used and the laboratory's procedures "could not convey what (the actual analyst) knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed" and would not expose "any lapses or lies on the certifying analyst's part." (*Ibid.*) The high court stated that, if the Sixth Amendment is violated, "no substitute procedure can cure the violation. . . ." (*Id.* at p. 2716.) The high court reiterated the principle stated in *Melendez–Diaz* that a document created solely for an evidentiary purpose in aid of a police investigation is testimonial. (*Bullcoming, supra,* at p. 2717.) Even though the analyst's certificate was not signed under oath, as occurred in *Melendez–Diaz*, the two documents were similar in all material respects. (*Bullcoming, supra,* at p. 2717.)

Earlier this year, in *Williams, supra,* 132 S.Ct. 2221, a rape case, the high court considered a forensic DNA expert's testimony that the DNA profile, which was derived from semen on vaginal swabs taken from the victim and produced by an outside laboratory, matched a DNA profile derived from the suspect's blood and produced by the state police laboratory. Justice Alito, writing with the concurrence of three justices and with Justice Thomas concurring in the judgment, concluded that the expert's testimony did not violate the defendant's confrontation rights. The plurality held that the outside laboratory report, which was not admitted into evidence (*id.* at pp. 2230, 2235), was "basis evidence" to explain the expert's opinion, was not offered for its truth, and therefore did not violate the confrontation clause. (*Id.* at pp. 2239–2240.) The plurality also supplied an alternative theory: even if the report been offered for its truth, its admission would not have violated the confrontation clause because the report was not a formalized statement made primarily to accuse a targeted individual. (*Id.* at pp. 2242-2244.) Applying an objective test in which the court looks "for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances" (*id.* at p. 2243), the *Williams* plurality found that the primary purpose of the outside laboratory report "was to catch

a dangerous rapist who was still at large, not to obtain evidence for use against (the defendant), who was neither in custody nor under suspicion at that time." (*Ibid.*) Further, the plurality found that no one at the outside laboratory could have possibly known that the profile it generated would result in inculpating the defendant, and, therefore, there was no prospect for fabrication and no incentive for developing something other than a scientifically sound profile. (*Id.* at pp. 2243–2244.) Justice Thomas concurred on the basis the report lacked the requisite formality and solemnity to be testimonial. (*Id.* at p. 2255 (conc. opn. of Thomas, J.).)

Most recently, the California Supreme Court in a trio of cases reexamined the meaning of "testimonial" within the context of the Sixth Amendment right to confront an adverse witness in light of the United States Supreme Court's decisions in *Crawford, Melendez-Diaz, Bullcoming,* and *Williams.* (*People v. Lopez* (2012) 55 Cal.4th 569; *People v. Dungo* (2012) 55 Cal.4th 608; *People v. Rutterschmidt* (2012) 55 Cal.4th 650.)

Of the trio of cases by the California Supreme Court, *People v. Dungo, supra,* 55 Cal.4th 608 (*Dungo*), a murder case, is the one that is most pertinent here. Rather than calling Dr. George Bolduc, the pathologist who performed the autopsy, the prosecution chose to present the expert testimony of Dr. Robert Lawrence, another forensic pathologist who was Dr. Bolduc's employer. (*Dungo, supra,* 55 Cal.4th at p. 613.) Dr. Lawrence testified that after reviewing the autopsy report and the accompanying autopsy photographs, he concluded the victim had died from asphyxia caused by strangulation, noting the victim had "'hemorrhages in the neck organs consistent with fingertips during strangulation'" and "'pinpoint hemorrhages in her eyes,'" which indicated a lack of oxygen. (*Id.* at p. 614.) Dr. Lawrence told the jury that his opinion the cause of death was strangulation also was supported by "'the purple color of (the victim's) face,'" the victim's biting of her tongue just before death, and the "'absence of any natural disease that can cause death.'" (*Ibid.*) Dr. Lawrence also testified the victim was strangled for "'more than two minutes'" because her hyoid bone was not fractured. (*Ibid.*) [Footnote: The record on appeal did not indicate whether Dr. Lawrence based his opinion solely on the autopsy photographs, solely on Dr. Bolduc's autopsy report, or on a combination of the two. (*Dungo, supra,* 55 Cal.4th at pp. 614-615.)] Dr. Lawrence said the victim's death could have occurred sooner if the hyoid bone had been fractured. (*Ibid.*)

In determining whether Dungo's right to confront witnesses against him was violated by Dr. Lawrence's testimony, the *Dungo* court focused on two of the "critical components" of the word "testimonial" in this context.

(*Dungo, supra,* 55 Cal.4th at p. 619.) "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Ibid.*)

Regarding the formality or solemnity aspect, the *Dungo* court held the autopsy and accompanying photographs were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right. (*Dungo, supra,* 55 Cal.4th at p. 621.) [Footnote: Justice Werdegar, who signed the majority opinion, noted in a concurring opinion: "The process of systematically examining the decedent's body and recording the resulting observations is thus one governed primarily by *medical* standards rather than by legal requirements of formality and solemnity." (*Dungo, supra,* 55 Cal.4th at p. 624 (conc. opn. of Werdegar, J.).)] The *Dungo* court noted Dr. Lawrence testified about objective facts concerning the condition of the victim's body as recorded in an autopsy report and accompanying photographs, and did not testify about the conclusions in the report. (*Id.* at p. 619.) "(S)tatements . . . which merely record objective facts . . . are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. (*Melendez–Diaz, supra,* 557 U.S. at p. 312, fn. 2 ('medical reports created for treatment purposes . . . would not be testimonial under our decision today').)" (*Dungo, supra,* at pp. 619-620.) "Dr. Lawrence's description to the jury of objective facts about the condition of (the) victim('s) body, facts he derived from Dr. Bolduc's autopsy report and its accompanying photographs, did not give defendant a right to confront and cross-examine Dr. Bolduc." (*Id.* at p. 621.) [¶] The *Dungo* court also found the autopsy report and accompanying photographs did not satisfy the second critical component of being testimonial-namely, having a primary purpose that "pertains in some fashion to a criminal prosecution." (*Dungo, supra,* 55 Cal.4th at pp. 619, 621.) The *Dungo* court noted autopsies are performed for a variety of purposes, and criminal investigation is only one of several objectives. (*Id.* at p. 621.)

### Analysis

At issue here are the two photographs that Kawachi took during her SART examination of Jeremiah that were used by Nelli to state her independent opinion, and whether Huynh's Sixth Amendment right was violated because he was not able to confront and cross-examine Kawachi.

These photographs, like the autopsy report and accompanying photographs in *Dungo* (see fn. 21, *ante*), depicted objective facts about the condition of Jeremiah's body. The photographs by themselves did not set forth Kawachi's conclusions or opinions about the results of the SART examination. "They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature." (*Dungo, supra,* 55 Cal.4th at p. 619.) The two SART examination photographs lacked the formality and solemnity that are a requirement of being testimonial. Therefore, Nelli's testimony stating objective facts about the condition of Jeremiah's body - facts she derived from the photographs that Kawachi took during the SART examination - did not give Huynh the right to confront and cross-examine Kawachi.

As to the *Dungo* court's second critical component of "testimonial" in this context-namely, whether the primary purpose pertains in some fashion to a criminal prosecution - we also conclude the photographs from the SART examination did not meet the test. Although SART examinations generally are more closely linked to criminal investigations than autopsies, the primary purpose of a particular SART examination is not necessarily for use in a criminal investigation. In this case, for example, when Jeremiah returned to Camp Pendleton, he did not know what had happened to him during the weekend. The SART examination was performed to determine if he was the victim of a sexual assault. In this regard, the plurality opinion in *Williams, supra,* 132 S.Ct. 2221 is instructive.

The *Williams* plurality found the purpose of the DNA profile, which was produced by the outside laboratory before any suspect had been identified, was to "find() a rapist who was on the loose." (*Williams, supra,* 132 S.Ct. at p. 2228 (plur. opn. of Alito, J.).) Thus, the "primary purpose" was *not* to "accus(e) a targeted individual of engaging in criminal conduct." (*Id.* at pp. 2242, 2243.) "In identifying the primary purpose of an out-of-court statement, we apply an objective test. (Citation.) We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." (*Id.* at p. 2243.)

When Jeremiah's SART examination took place in June 2009, there was no criminal investigation of Huynh; Huynh did not become a suspect until September. The photographs of the anus and rectum depicted the condition of these areas and were taken to document whether Jeremiah was sodomized. The primary purpose of the photographs that Nelli relied on was to show the condition of the body. In taking the photographs, there was no likelihood of

falsification and no motivation to produce anything other than a reliable depiction of Jeremiah's injuries, if any. The photographs were not taken for the primary purpose of accusing a targeted individual. Therefore, Nelli's use of the photographs was not testimonial and did not violate Huynh's right to confront and cross-examine the photographer (Kawachi).

Huynh's Sixth Amendment right was not violated by Nelli's testimony. [Footnote: We also do not read *Crawford* and its progeny as standing for the proposition that expert witnesses are no longer permitted to testify about their expert opinions on relevant matters based on photographs and reports prepared by others.]

(ECF No. 12-4, <u>People v. Huynh</u>, No. D060327, slip op. at 48-57.)

"The Sixth Amendment guarantees a criminal defendant the right to be confronted with the witnesses against him." <u>United States v. Romo-Chavez</u>, 681 F.3d 955, 961 (9th Cir. 2012). However, the Confrontation Clause does not apply to non-testimonial evidence. <u>Davis v. Washington</u>, 547 U.S. 813, 821 (2006). Testimonial statements are the functional equivalent of court testimony, such as affidavits, depositions, confessions, or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available to use at a later trial." <u>Crawford v. Washington</u>, 541 U.S. 36, 51-52 (2004).

Claire Nelli testified that she is a registered nurse, the owner of the SART facility where Jeremiah was seen, and is responsible for training and supervising the nurses employed there, and maintaining professional standards. (RT 1086-93.) After testifying about the protocol of a SART examination, Nelli testified as to what evidence was collected from Jeremiah, including his hair, blood, urine, flossing from his teeth, and swabs from his penis, mouth, scrotum and rectum, stating that all samples were collected and sealed pursuant to protocol. (RT 1122-23.) She identified photographs of Jeremiah's full body, his face, the contents of his pockets, and his anus and rectum. (RT 1125-27.) After describing in detail what the photographs of the anus and rectum showed, including two open wounds, she stated: "I find these injuries significant because the laceration is still bleeding." (RT 1129-31.)

1        It was consistent with clearly established federal law for the state court to find that
2    the photographs of Jeremiah's anus and rectum which Nelli used to base her opinion that
3    they showed injury, were not testimonial in nature, particularly since the photographs were
4    taken before the police had a suspect. See Melendez-Diaz, 557 U.S. at 312 n.2 ("medical
5    reports created for treatment purposes . . . would not be testimonial under our decision
6    today."); Giles v. California, 554 U.S. 353, 376 (2008) ("statements to physicians in the
7    course of receiving treatment" are not testimonial). Even if there is a reasonable argument
8    that an objective observer could believe that when Jeremiah was being examined by the
9    SART nurse, photographs of his anus and rectum could be used at a later trial, see
10   Crawford, 541 U.S. at 52 (identifying as testimonial "statements that were made under
11   circumstances which would lead an objective witness reasonably to believe that the
12   statement would be available for use at a later trial"), the Supreme Court has recognized
13   that the instant situation, where a SART nurse's supervisor testified because the SART
14   nurse was unavailable, has not been addressed by the Supreme Court. See Bullcoming,
15   564 U.S. at 672 (Sotomayor, J., concurring) ("[T]his is not a case in which the person
16   testifying is a supervisor, reviewer, or someone else with a personal, albeit limited,
17   connection to the scientific test at issue.") Thus, the state court adjudication could not be
18   contrary to or an unreasonable application of clearly established federal law. Crater v.
19   Galaza, 491 F.3d 1119, 1123 (9th Cir. 2007) (recognizing that if federal habeas relief
20   depends on the resolution of a question left open by United States Supreme Court decisions,
21   relief is precluded under 28 U.S.C. § 2254(d)(1)).

22       Petitioner contends the state court made an unreasonable determination of the facts
23   in finding that Nelli only testified as to the photographs of Jeremiah's anus and rectum,
24   because she was in fact asked by the prosecutor if an anal swab had been taken from
25   Jeremiah. (ECF No. 18 at 20-21.) Even if Petitioner could satisfy 28 U.S.C. § 2254(d)(2),
26   a Confrontation Clause violation is subject to harmless error review, United States v.
27   Nielsen, 371 F.3d 574, 581 (9th Cir. 2004), and such an error is harmless unless Petitioner
28   can show it had a "substantial or injurious effect or influence in determining the jury's

verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

Petitioner alleged in state court that without Nelli's testimony Jeremiah's claims were uncorroborated, and the jury might not have believed him because the investigation was initiated by military personnel not Jeremiah, and because Jeremiah testified that any admission by him of voluntary ingestion of drugs and consensual homosexual conduct with Petitioner could lead to discharge from the military. (ECF No. 12-2 at 118.) However, Jeremiah's testimony was corroborated not just by the SART exam showing injuries to his anus and the presence of Petitioner's sperm on the samples taken from his mouth, penis and anus, but also by the overwhelming evidence discussed in claim one that Petitioner's modus operandi was to do to Jeremiah what he had done to Williams and three other young men who testified at trial. In addition, his argument that the introduction of the photographs of Jeremiah's anus and rectum were inflammatory and more prejudicial than probative (ECF No. 18 at 11-12), does not provide a basis for habeas relief because claims based on state evidentiary rulings are not cognizable on federal habeas unless the admission of the evidence was so prejudicial it rendered his trial fundamentally unfair. Estelle, 502 U.S. at 70-73. Petitioner has not made that showing. In sum, Petitioner has not shown that his right to confrontation was violated by the introduction of the non-testimonial evidence from the SART examination, or that any such error had a "substantial or injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

Petitioner also contends that his right to confront Jeremiah was violated when his videotaped preliminary hearing testimony was played for the jury in lieu of an appearance at trial. (ECF No. 1-1 at 4, 10.) This claim was presented to the state appellate and supreme courts on direct appeal. (ECF No. 12-2 at 120-22; ECF No. 12-9 at 41-42.)

/ / /

The last reasoned state court decision as to this claim is the state appellate court opinion:

Huynh contends the trial court also violated his Sixth Amendment right to confront witnesses by allowing the prosecution to present the preliminary hearing testimony of Jeremiah, who refused to appear at trial. The contention is without merit.

Although the confrontation clause guarantees a criminal defendant the right to confront prosecution witnesses, the right is not absolute. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295; *People v. Cromer* (2001) 24 Cal.4th 889, 897.) "Traditionally, there has been 'an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant (and) which was subject to cross-examination. . . .'" (*People v. Cromer, supra*, at p. 897.) "Pursuant to this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right." (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

A witness is considered "unavailable" if "(a)bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "Reasonable diligence, often called 'due diligence' in case law, '"connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."'" (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.)

Jeremiah, who lived in Kentucky, did not appear at trial despite court orders under the Uniform Act to Secure the Attendance of Witnesses (Uniform Act) to do so. [Footnote: The Uniform Act, as adopted in California, allows "a party in a criminal case (to) ask a court in the state where an out-of-state material witness is located to subpoena the witness and also to have the witness taken into custody and brought to the prosecuting state to testify." (*People v. Cogswell, supra*, 48 Cal.4th at p. 471; § 1334 et. seq.)] Shortly before trial, Jeremiah's mother phoned the prosecution and left a message that her son would not be traveling to California to testify at Huynh's trial. A prosecutor and an investigator returned the mother's call. She told them that Jeremiah could not go through with testifying at trial and nothing could be said that would convince them otherwise. The investigator traveled to Kentucky to meet with Jeremiah and his mother, but their position was not changed. Subsequently, the prosecution invoked the Uniform Act and had a Kentucky court issue a summons to Jeremiah to appear at trial in San Diego.

> The prosecution did not seek to invoke the custody-and-delivery provision of the Uniform Act. (See [prior footnote].) The trial court declared Jeremiah unavailable, noting "(t)he People have done everything they can to obtain the appearance of Jeremiah." The court ruled the prosecution could present Jeremiah's preliminary hearing testimony, which had been videotaped.
>
> As Huynh acknowledges, *People v. Cogswell, supra*, 48 Cal.4th 467 is controlling. In that case, a rape victim visiting California from Colorado testified against the defendant at the preliminary hearing and then returned to Colorado. (*Id.* at p. 471.) The victim refused to testify at trial even after the prosecution asked a court in Colorado to issue a subpoena under the Uniform Act. (*Ibid.*) Our Supreme Court held the trial court correctly found the victim to be an unavailable witness even though the prosecution had not taken advantage of the Uniform Act's custody-and-delivery provision "in order to show in this case the sexual assault victim's unavailability as a witness at defendant's trial." (*Id.* at 476.)
>
> The trial court properly found Jeremiah unavailable at trial and did not violate Huynh's Sixth Amendment rights by allowing the prosecution to play the videotape of Jeremiah's preliminary hearing testimony.

(Lodgment No. 4, <u>People v. Huynh</u>, No. D060327, slip op. at 58-60.)

The introduction of prior testimonial statements of a witness violates a defendant's confrontation rights unless the person who made the statements is unavailable to testify and there was a prior opportunity for cross-examination. <u>Crawford</u>, 541 U.S. at 68. Because Petitioner had an opportunity to cross-examine Jeremiah at the preliminary hearing, the only issue is unavailability. See <u>United States v. Yida</u>, 498 F.3d 945, 950 (9th Cir. 2007) ("The constitutional requirement that a witness be 'unavailable' before his prior testimony is admissible stands on separate footing that is independent of and in addition to the requirement of a prior opportunity for cross-examination."), citing <u>Barber v. Page</u>, 390 U.S. 719, 724-25 (1968) (holding that admission of prior testimony violated the Confrontation Clause because the state did not prove the witness was unavailable irrespective of whether the witness was cross-examined during prior testimony).

Clearly established federal law provides that "a witness is not 'unavailable' for purposes of the . . . confrontation requirement unless the prosecutorial authorities have

15cv1924-BTM (AGS)

1  made a good-faith effort to obtain his presence at trial." Hardy v. Cross, 565 U.S. 65, 69
2  (2011), quoting Barber, 390 U.S. at 724-25 (holding that a witness was not unavailable
3  where the State made absolutely no effort to obtain the presence of the witness at trial,
4  despite knowing he was in federal custody and having the ability to seek his attendance
5  through a writ of habeas corpus ad testificandum). The record here supports a finding that
6  the prosecution made a good-faith effort to secure Jeremiah's attendance at trial by initially
7  contacting him through his mother, and when she told them he refused to attend trial,
8  sending an investigator to Kentucky to contact him in person in an attempt to change his
9  mind, and when he still refused, invoking the Uniform Act and having a Kentucky court
10 issue a summons for Jeremiah to appear at trial. See Ohio v. Roberts, 448 U.S. 56, 74
11 (1980) ("The lengths to which the prosecution must go to produce a witness is a question
12 of reasonableness . . . [and] the ultimate question is whether the witness is unavailable
13 despite good-faith efforts undertaken prior to trial to locate and present that witness."),
14 overruled on other grounds by Crawford, 541 U.S. at 60.

15     Petitioner contends the prosecution should have attempted to take Jeremiah into
16 custody to compel him to attend trial. (ECF No. 1-1 at 4.) However, "the deferential
17 standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn
18 a state court's decision on the question of unavailability merely because the federal court
19 identifies additional steps that might have been taken." Hardy, 565 U.S. at 72; see also id.
20 at 71 ("We have never held that the prosecution must have issued a subpoena if it wishes
21 to prove that a witness who goes into hiding is unavailable for Confrontation Clause
22 purposes, and the issuance of a subpoena may do little good if a sexual assault witness is
23 so fearful of an assailant that she is willing to risk his acquittal by failing to testify at trial.")

24     Even if Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d) with respect
25 to the unavailability prong of his confrontation claim, he is not entitled to federal habeas
26 relief unless he can show that the error in finding Jeremiah unavailable at trial had a
27 "substantial and injurious effect or influence in determining the jury's verdict." Brecht,
28 507 U.S. at 637. Evidence supporting Petitioner's convictions for sodomy and oral

copulation of an intoxicated person regarding Jeremiah included the SART exam results showing an anal injury and Petitioner's semen in Jeremiah's anus, mouth and penis, and Petitioner's modus operandi of drugging and sexually assaulting men like Jeremiah. The reasons why live testimony is preferred over reading prior testimony from a cold record are not present here, where a videotape of Jeremiah's testimony was played for the jury. See Yida, 498 F.3d at 950-52 (identifying such reasons as the ability to observe the demeanor of the witness, inability to update the testimony with recent events, lack of ability to expose inconsistencies between new and prior testimony, and allowing the prosecution the opportunity to decide whether live or prior testimony is more useful). Petitioner has failed to show that his ability to confront and cross-examine Jeremiah at the preliminary hearing actually impaired his defense at trial, and has not shown the failure to secure his presence at trial had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

Petitioner next claims that his right to federal due process was violated by the failure to instruct the jury on lesser included offenses of battery, second degree murder and involuntary manslaughter. (ECF No. 1-1 at 7, 9, 11.) These claims were presented to the state appellate and supreme courts on direct appeal. (ECF No. 12-2 at 86-103; ECF No. 12-9 at 25-30, 39-41.)

The last reasoned state court decision addressing this claim is the state appellate court opinion, which rejected the claim on the basis that: (1) battery is not a lesser included offense to the oral copulation and sodomy counts, and even if it is, substantial evidence did not exist to support the instruction; (2) second degree murder is not a lesser included offense of first degree felony murder, and even if it is, there was a lack of substantial evidence that the killing was anything other than a murder committed in the perpetration of sodomy and oral copulation, and the failure to give the instruction was harmless because the true finding by the jury on the special circumstance allegations establish they found him guilty of first degree felony murder; and (3) sufficient evidence did not exist to support an involuntary manslaughter instruction, and the failure to so instruct was in any case

harmless because the jury found him guilty of first degree felony murder. (ECF No. 12-4, People v. Huynh, No. D060327, slip op. at 37-48.)

"Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976). However, that "general statement may not apply to every habeas corpus review, because the criminal defendant is also entitled to adequate instructions on his or her theory of defense." Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984); Bradley v. Duncan, 315 F.3d 1091, 1098-1101 (9th Cir. 2002) (granting habeas relief under 28 U.S.C. § 2254(d) based on finding that the failure to instruct on entrapment deprived petitioner of his only defense). Petitioner contends that an element of manslaughter is the absence of felony conduct, and "the presence of sperm inside Williams' mouth necessarily indicated that Williams opened his mouth without threat of force," which may have allowed him to believe Williams consented to sex. (ECF No. 18 at 17.) Petitioner has not shown that the failure to instruct on the lesser included offenses of battery, second degree murder or manslaughter deprived him of a defense. Rather, his defense was that Williams did not die as a result of a sexual assault, and he continues to maintain, as he states in his Petition, that: "I, petitioner, declare under penalty of perjury that I did not kill or hurt Mr. Williams." (ECF No. 1-1 at 3.)

Petitioner next claims his right to federal due process was violated by the failure to properly instruct the jury on causation, which deprived him of his right to present a defense. (ECF No. 1-1 at 6-7, 9.) This claim was presented to the state appellate and supreme courts on direct appeal. (ECF No. 12-2 at 60-67; ECF No. 12-9 at 22-25.) He alleged that the instructions did not inform the jury there must be a logical nexus between the cause of death and the oral copulation or sodomy offenses, which had to involve more than just their occurrence at the same time. (ECF No. 12-2 at 64-66.) The appellate court stated:

> In this single-perpetrator felony-murder case, the trial court did not err by rejecting Huynh's request for instructions espousing these causation principles. Such causation principles are only pertinent in certain types of felony-murder cases. The first type involves more than one perpetrator - the

15cv1924-BTM (AGS)

so-called """"complicity aspect"""" of the felony-murder rule. (*Cavitt, supra,* 33 Cal.4th at p. 196.) An example would be "'nonkiller's liability for the felony murder committed by another.'" (*Ibid.*) The second type is where other acts allegedly caused the death. (See *People v. Billa, supra,* 31 Cal.4th at p. 1072.)

However, our Supreme Court has made it clear that in a case such as this one, which involves a single perpetrator, application of the felony-murder rule lies outside the context of causation principles, such as proximate causation, natural and probable consequences and foreseeability. In other words, the felony-murder rule imposes a type of strict liability on the perpetrator acting on his or her own. "(F)irst degree felony murder encompasses a far wider range of individual culpability than deliberate and premeditated murder. It includes not only the latter, but also a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable." (*People v. Dillon* (1983) 34 Cal.3d 441, 477.) "Once *a person* has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning – if death results from his commission of that felony it will be first degree murder, regardless of the circumstances." (*People v. Burton. supra,* 6 Cal.3d at pp. 387-388, emphasis added.) Accordingly, the felony-murder rule generally does not require proof of a strict causal relationship between the underlying felony and the killing if there is one actor, and the felony and the killing are part of one continuous transaction.

Huynh principally relies on CALCRIM jury instructions that apply to felony-murder cases involving more than one perpetrator or present unusual situations. He points to CALCRIM Nos. 540B and 540C, both of which include language requiring a logical connection between the underlying felony and the killing: "There was a logical connection between the cause of death and the (underlying felony). . . . The connection between the cause of death and the (underlying felony) must involve more than just their occurrence at the same time and place." (CALCRIM Nos. 540B & 540C.) This language is identical to the language in CALCRIM No. 730, which the court omitted, and is also similar to the language of Huynh's requested special jury instruction, which the court refused to give. CALCRIM No. 540C also contains causation language similar to the "natural and probable consequence" language of CALCRIM No. 240.

Huynh's reliance on CALCRIM Nos. 540B and 540C is misplaced because those instructions are intended for felony-murder cases that do not involve a single perpetrator. The drafters of the CALCRIM Instructions advise CALCRIM No. 540B applies to felony-murder cases in which a coparticipant committed the killing. (Judicial Counsel of Cal., Crim. Jury Instns., *supra*, Introduction to Felony-Murder Series, pp. 291-291.) The drafters also advise CALCRIM No. 540C applies to felony-murder cases, involving "unusual factual situations where a victim dies during the course of a felony as a result of a heart attack, a fire, or a similar cause, rather than as a result of some act of force or violence committed against the victim by one of the participants." (*Id.* at p. 291.)

Thus, Huynh is attempting to graft onto this single-perpetrator felony-murder case instructional requirements meant for the """"complicity aspect"""" of the felony murder rule (*Cavitt, supra*, 33 Cal.4th at p. 196), or cases in which a person is killed during commission of a felony but dies as a result of other causes. (Judicial Council of Cal., Crim. Jury Instns., *supra*, Introduction to Felony-Murder Series, pp. 291-292; see also *People v. Billa, supra*, 2 Cal.App.3d at pp. 209-211 (heart attack caused by robbery).) Such instructional requirements are not appropriate where, as here, the victim died in the course of felony conduct perpetrated by a defendant acting on his own.

For similar reasons, the court did not err in refusing to instruct pursuant to CALCRIM No. 240. The natural and probable consequences theory of causation was not relevant to the legal principles applicable in this case. (*People v. Chavez, supra*, 37 Cal.2d at p. 669; *People v. Stamp, supra*, 2 Cal.App.3d at p. 210.) Likewise, the bench note to CALCRIM No. 540A, which states the court has a sua sponte duty to give CALCRIM No. 240 if causation is an issue (Judicial Council of Cal., Crim. Jury Instns., *supra*, Bench Notes to CALCRIM No. 540A, p. 294), is misleading as the instruction does not apply where death results during felony conduct undertaken by a single perpetrator.

(ECF No. 12-4, People v. Huynh, No. D060327, slip op. at 31-34.)

In order to merit federal habeas relief, Petitioner must show the instructional error "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 431 U.S. 145, 154 (1977), quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). A jury instruction that relieves the prosecution of its burden of proving every element of an offense beyond a reasonable doubt violates due process. Id. at 153.

1    Petitioner contends he was deprived of the opportunity to prove that Williams died

2    of something unrelated to the sexual assault by the failure to instruct the jury that there

3    needed to be a causal nexus between his sodomizing or orally copulating Williams while

4    he was intoxicated and Williams' death, because many of the medical experts testified that

5    it was difficult or impossible to ascertain the exact cause of death. As set forth above in

6    claim one, the crux of the defense was that the cause of death could not be ascertained by

7    the medical experts, who, other than Dr. Benumof, all spoke in terms of possibilities. The

8    jury was instructed the prosecution had to prove that Petitioner committed or attempted to

9    commit sodomy or oral copulation of an intoxicated person, intended to commit those

10   offenses, and "while committing or attempting to commit [those offenses] caused the death

11   of another person." (RT 3912-13.)

12       The jury was also instructed that:

13           Dane Williams may have suffered from an illness or physical condition
         that made him more likely to die from an injury than the average person. The
14       fact that Dane Williams may have been more physically vulnerable is not a
         defense to murder. If the defendant's act was a substantial factor causing the
15       death, then the defendant is legally responsible for the death.
16

17           This is true even if Dane Williams would have died in a short time as a
         result of other causes or if another person of average health would not have
18       died as a result of the defendant's actions. [¶] If you have a reasonable doubt
         whether the defendant's act caused the death, you must find him not guilty.
19

20   (RT 3915-16.)

21       Because the jury was instructed that they must find beyond a reasonable doubt that

22   Petitioner's act caused Williams' death, Petitioner has not shown that his ability to present

23   his defense that Williams died of something unrelated to being sexually assaulted was

24   hampered by the causation instructions as given, and has failed to show that the rejection

25   of this claim by the state court is contrary to, or involves an unreasonable application of,

26   clearly established federal law. See California v. Roy, 519 U.S. 2, 5 (1996) (holding that

27   to establish a federal due process violation arising from the omission of a jury instruction,

28   a petitioner must overcome an "especially heavy" burden of showing that the omitted

instruction should have been given and that its omission "so infected the entire trial that the resulting conviction violates due process.")

Petitioner next claims that his right to federal due process was violated by the failure of the trial court to instruct the jury that intent to kill is an element of murder under the felony murder rule. (ECF No. 1-1 at 11.) Although this claim has not been presented to any state court, it can be denied as entirely without merit. Cassett, 406 F.3d at 623-24.

The state appellate court, in a related claim, noted:

> The felony-murder doctrine provides a killing is first degree murder if "committed in the perpetration" of certain enumerated felonies, including sodomy and oral copulation. (§ 189.) The killing is first degree murder "regardless of whether it was intentional or accidental." (*People v. Coefield* (1951) 37 Cal.2d 865, 868.) The requisite mental state is simply the specific intent to commit the underlying felony because only felonies which are inherently dangerous to life or pose a significant prospect of violence are listed in section 189. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).)

(Lodgment No. 4, People v. Huynh, No. D060327, slip op. at 27.)

The Ninth Circuit has recognized that intent to kill is not an element of felony murder in California where the defendant is the killer, and has rejected a federal due process claim on that basis. James, 24 F.3d at 25-26; see also Harmelin v. Michigan, 501 U.S. 957, 1004 (1991) ("the crime of felony murder without specific intent to kill [is] a crime for which 'no sentence of imprisonment would be disproportionate.'") (concurring opinion of Kennedy, J.), quoting Solem v. Helm, 463 U.S. 277, 290, n. 15 (1983).

Petitioner next alleges he was denied due process because the trial judge was biased. (ECF No. 1-1 at 12.) Although this claim has not been presented to any state court, it can be denied as entirely without merit. Cassett, 406 F.3d at 623-24. "A showing of judicial bias requires facts sufficient to create actual impropriety or an appearance of impropriety." Greenway v. Schriro, 653 F.3d 790, 806 (9th Cir. 2011). These include "circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 877 (2009), quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975).

15cv1924-BTM (AGS)

"The supreme court has recognized only a few circumstances in which an appearance of bias necessitates recusal to ensure due process of law," Greenway, 653 F.3d at 806-07, including where the trial judge had a pecuniary interest, Tumey v. Ohio, 273 U.S. 510, 523 (1927), where the judge acted as both the grand jury and the trier of fact, In re Murchison, 349 U.S. 133, 137 (1955), where defendant rudely insulted a judge who then presided over contempt proceedings, Mayberry v. Pennsylvania, 400 U.S. 455, 465-66 (1971), and where a party was a large donor to the judge's election campaign, Caperton, 556 U.S. at 872.

The only support for this claim is an alleged comment by the trial judge about Petitioner that "he's a character but he got no character." (ECF No. 1-1 at 12.) Petitioner provides no record citation for the remark, and has alleged no facts to support his claim that the trial judge was biased, which fails as conclusory. Blackledge, 431 U.S. at 74.

In the final aspect of claim four, Petitioner alleges his federal due process rights were violated by the cumulative effect of the trial errors. (ECF No. 1-1 at 7.) This claim was presented to the state appellate and supreme courts on direct appeal. (ECF No. 12-2 at 127; ECF No. 12-9 at 44.)

The state appellate court rejected this claim, stating:

> Finally, Huynh contends there was cumulative error. "To the extent there are a few instances in which we have found error or assumed its existence, no prejudice resulted. The same conclusion is appropriate after considering their cumulative effect." (*People v. Valdez* (2012) 55 Cal.4th 82, 181.) Similarly, the cumulative effect of any errors in this case was not prejudicial.

(ECF No. 12-2, People v. Huynh, No. D060327, slip op. at 61-62.)

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers, 410 U.S. at 298, 302-03. Where no single trial error is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). Where "there are a number of errors at trial,

1  'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the
2  overall effect of all the errors in the context of the evidence introduced at trial against the
3  defendant." Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988).
4  "Where the government's case is weak, a defendant is more likely to be prejudiced by the
5  effect of cumulative errors." Frederick, 78 F.3d at 1381.

6        The prosecution's case against Petitioner was not weak. Although the evidence that
7  Williams died while he was being sexually assaulted by Petitioner was circumstantial, this
8  is not a situation where the prosecution's case was so weak as to find a cumulative effect
9  of trial errors. But even if causation regarding Williams' death presented a close case due
10  to conflicting medical testimony, Petitioner's alleged errors do not cumulate to a prejudicial
11  level. Accordingly, habeas relief is denied as to claim four.

12        **F.    Claim Five**
13        Petitioner alleges in his fifth and final claim that his right to be free from
14  unreasonable search and seizures as protected by the Fourth Amendment was violated by
15  a second, warrantless search of his home, during which the watches introduced against him
16  were seized. (ECF No. 1 at 9; ECF No. 1-1 at 6.) Respondent answers that this claim is
17  not cognizable on federal habeas because Petitioner's trial counsel filed a motion to
18  suppress the watches on that basis, which was fully and fairly litigated in the trial court.
19  (ECF No. 16-1 at 14-16.) Although this claim has not been raised in state court, it can be
20  denied because it is not cognizable on federal habeas. Cassett, 406 F.3d at 623-24.

21        "[W]here the State has provided an opportunity for full and fair litigation of a Fourth
22  Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the
23  ground that evidence obtained in an unconstitutional search or seizure was introduced at
24  his trial." Stone v. Powell, 428 U.S. 465, 494 (1976). Under California law, a defendant
25  can move pretrial to suppress evidence on the basis that the evidence was obtained in
26  violation of the Fourth Amendment. See Cal. Penal Code § 1538.5 (West 2011).

27        In Gordon v. Duran, 895 F.2d 610 (9th Cir. 1990), the court found it unnecessary to
28  reach the issue of whether or not the petitioner's Fourth Amendment claim was, in fact,

fully and fairly litigated, because the fact that California provides an opportunity to fully and fairly litigate such claims through Penal Code § 1538.5 precludes federal habeas review, irrespective of whether or not the petitioner availed himself of the opportunity. Gordon, 895 F.2d at 613-14. Accordingly, the Court is precluded from granting habeas relief on Petitioner's Fourth Amendment claim. See Stone, 428 U.S. at 494; Gordon, 895 F.2d at 613-14. Habeas relief is denied as to Claim 5.

## G. Evidentiary Hearing and Discovery

Petitioner argues that an evidentiary hearing should be held regarding the newly discovered evidence supporting his actual innocence claim, and that a hearing is not precluded by a failure to develop the record in state court. (ECF Nos. 80, 82.) He also argues that good cause exists to allow discovery to further develop his contention that a scientific basis exists to show Williams died of natural causes related to this heart condition to undermine the trial testimony that an obstruction to his airway caused his death. (ECF Nos. 65, 70.) However, neither discovery nor an evidentiary hearing are necessary where, as here, the federal claims can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994); see also Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("It follows that if the record . . . precludes habeas relief, a district court is not required to hold an evidentiary hearing."); Holland v. Jackson, 542 U.S. 649, 653 (2004) (holding that the same restrictions placed on evidentiary hearings applies for discovery).

Petitioner also argues that recent developments in California law impact the validity of his felony murder conviction. (ECF No. 80 at 12-13.) He notes that California SB-1437 amended "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." People v. Verdugo, 44 Cal.App.5th 320, 325 (2020). As of January 1, 2019, any person convicted of felony murder under a natural and probable consequences doctrine prior to the change in law can

petition the sentencing court to vacate the conviction and resentence them on any remaining counts. See Cal. Penal Code § 1170.95 et seq. To the extent this is intended to be a new claim, it is unexhausted and not cognizable on federal habeas because any entitlement to relief is strictly a matter of the application of state law to which this Court must defer. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1982) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Bradshaw v. Richey, 546 U.S. 74, 76 (2006) (holding that an interpretation of state law by a state court "binds a federal court sitting in habeas corpus.") Petitioner notes that the California Supreme Court recently reaffirmed in In re Martinez, 3 Cal.5th 1216, 1225-26 (2017) what it held in People v. Chiu, 59 Cal.4th 155 (2014), that a person cannot be validly convicted of first degree murder under an aider and abettor theory based on the natural and probable consequences doctrine of felony murder. (ECF No. 80 at 13.) Those cases are irrelevant here because Petitioner was not convicted of aiding and abetting murder but found by a jury to have caused the victim's death. To the extent this is a restatement of the jury instruction causation subpart of Claim 4, it is without merit for the reasons discussed above with respect to that claim. See People v. Cervantes, __ Cal.Rptr.3d __, 2020 WL 1129031 at *5 (Mar. 9, 2020) ("The natural and probable consequences instruction was correct when the trial court gave it, and SB 1437 does not apply retroactively to make the instruction erroneous.") Finally, Petitioner argues this Court should declare invalid the use in California of non-violent felonies, such as rape of an unconscious person, to support a special circumstance finding. (ECF No. 80 at 13.) This is a wholly conclusory claim without supporting argument and is therefore insufficient to support federal habeas relief. To the extent any of those issues are raised as separate claims, the Court denies relief.

## H.   Request for Appointment of Counsel

Petitioner states that appointment of counsel is necessary where an evidentiary hearing is required or to avoid a denial of due process in a complex case. (ECF No. 32.) The Sixth Amendment right to counsel does not extend to federal habeas corpus actions by

state prisoners. <u>McCleskey v. Zant</u>, 499 U.S. 467, 495 (1991); <u>Knaubert v. Goldsmith</u>, 791 F.2d 722, 728 (9th Cir. 1986). Financially eligible habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may obtain representation when "the district court 'determines that the interests of justice so require.'" <u>Terrovona v. Kincheloe</u>, 912 F.2d 1176, 1181 (9th Cir. 1990), quoting 18 U.S.C. § 3006A(a)(2)(B). Appointment of counsel is discretionary where no evidentiary hearing or discovery is necessary. <u>Terrovona</u>, 912 F.2d at 1177; <u>Knaubert</u>, 791 F.2d at 728.

The record does not support Petitioner's contention that appointment of counsel is necessary. As already discussed, the factual record is adequately developed, and neither discovery nor an evidentiary hearing are required to resolve this matter. In addition, "[i]ndigent state prisoners applying for habeas relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations." <u>Chaney v. Lewis</u>, 801 F.2d 1101, 1196 (9th Cir. 1986); <u>Knaubert</u>, 791 F.2d at 728-29. Failure to appoint counsel may result in a due process violation if the issues involved are too complex for the petitioner. <u>Hawkins v. Bennett</u>, 423 F.2d 948, 950 (8th Cir. 1970). "A district court should consider the legal complexity of the case, the factual complexity of the case, the petitioner's ability to investigate and present his claim, and any other relevant factors." <u>Abdullah v. Norris</u>, 18 F.3d 571, 573 (8th Cir. 1994). Where, as here, "the issues involved can be properly resolved on the basis of the state court record, a district court does not abuse its discretion in denying a request for court-appointed counsel." <u>Hoggard v. Purkett</u>, 29 F.3d 469, 471 (8th Cir. 1994); <u>LaMere v. Risley</u>, 827 F.2d 622, 626 (9th Cir. 1987) (finding appointment of counsel unnecessary where petitioner's "district court pleadings illustrate to us that he had a good understanding of the issues and the ability to present forcefully and coherently his contentions.") The interests of justice do not warrant the appointment of counsel here.

## I.    Motion to File Legal Memorandum in Support of Petition

Petitioner has filed a Motion for Leave to file a supplemental memorandum of points and authorities in support of his Petition, in which he reasserts arguments regarding his

1 challenge to the cause of death through scientific literature in support of his actual
2 innocence claim, his challenge to the laboratory procedures in support of his due process
3 claim, and in support of his search and seizure claim. (ECF No. 92.) The motion for leave
4 to file the memorandum is **GRANTED**. The Court has considered the supplemental
5 memorandum and its attached exhibits, all of which are cumulative to Petitioner's previous
6 submissions, and finds they fail to provide a basis to grant any claim in the Petition for the
7 reasons already discussed.

8    **J.    Certificate of Appealability**

9    The threshold for granting a Certificate of Appealability is "relatively low."
10 Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002). "[T]he only question is
11 whether the applicant has shown that jurists of reason could disagree with the district
12 court's resolution of his constitutional claims or that jurists could conclude the issues
13 presented are adequate to deserve encouragement to proceed further." Buck v. Davis, 580
14 U.S. ___, 137 S.Ct. 759, 773 (2017).

15    A Certificate of Appealability is granted as to claims 1, 2, 3 and 4 except as noted
16 below, for which it is denied. The Certificate of Appealability is denied as to the following
17 sub claims of claim 3: ineffective assistance of counsel based on a hostile relationship
18 between trial counsel and Huynh; counsel's failure to move for a change of venue;
19 counsel's failure to request an instruction on the felony murder escape rule; counsel's
20 failure to present evidence implicating Antonio Torres; and counsel's failure to object to
21 alleged remarks by the trial judge.

22    A Certificate of Appealability is denied as to the following sub parts of claim 4: the
23 admission of Petitioner's sex crimes and propensity evidence; alleged error regarding
24 failure to instruct on intent to kill; and the alleged bias of the trial judge. A Certificate of
25 Appealability is denied as to all claims in claim 5.

26 **VI.    CONCLUSION**

27    Based on the foregoing, the Petition for a Writ of Habeas Corpus (ECF No. 1) is
28 **DENIED**. A Certificate of Appealability is **GRANTED** only as set forth above. The

15cv1924-BTM (AGS)

motions for discovery, an evidentiary hearing and appointment of counsel are **DENIED**. Petitioner's Requests for Judicial Notice are **GRANTED** and treated as supplemental argument in support of the Petition. Petitioner's Motion for Leave to file a supplemental memorandum of points and authorities in support of his Petition is **GRANTED**. The Order to Show Cause why the case should not be dismissed as untimely is **VACATED**. The Clerk shall enter final judgment accordingly. Since this is a final decision by a District Judge rather than a Report and Recommendation by a Magistrate Judge, no objections are necessary. The time to appeal starts upon entry of final judgment by the Clerk of Court.

DATED: _March 19, 2020_     _Barry Ted Moskowitz_

                                HON. BARRY TED MOSKOWITZ
                                UNITED STATES DISTRICT JUDGE

15cv1924-BTM (AGS)